PAUL CLARK ET AL. v. PENNA. R. CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY.

Argued October 8, 1891—Decided November 9, 1891.
[To be reported.]

1. The right of an upper riparian owner to divert the water of a stream for manufacturing or other purposes having no necessary relation to his use of his land, is limited, as between himself and a lower proprietor, to so much of the water as will not materially or sensibly diminish its quantity. No matter what are the necessities of his business, he has no right to more than this.*

2. Such diversion of the water, to an extent materially lessening its flow, even without actual injury to a lower riparian proprietor, legally imports damage, as it is an infringement of a right; and if no other dam-

———————

* Compare Lentz v. Carnegie, post, 612; Gallagher v. Kemmerer, 144 Pa. 509.

Statement of Facts.

age be established, the party whose right is thus infringed is entitled to nominal damages: Miller v. Miller, 9 Pa. 74; Del. etc. Canal Co. v. Torrey, 33 Pa. 143; Graver v. Sholl, 42 Pa. 58.

3. For such diversion, however, a lower proprietor cannot recover special damages, on the ground that it interfered with the water power upon his land, when, during the period of time covered by his action, he had upon his land no mill or other means of using or applying the water power, made no attempt to use it, and gave to the defendant no notice of any purpose so to do.

4. If he had it in contemplation to erect a mill, he could have vindicated his right by successive actions of trespass; or, after establishing his right at law, he could have enjoined its invasion by proceedings in equity. He might, perhaps, have laid grounds for special damages, by giving notice of his purpose to avail himself of the water power by using or leasing it: Per Mr. Justice CLARK.

5. The true rule of damages, in such case, is to estimate the injury sustained from the diversion of the water in the use of the land for the purposes to which it was devoted, or for which it would have been used but for the refusal of the defendant, upon notice, to discontinue the diversion. As a means of computation, a reduction in rental value from this cause may be shown.

6. But the rental value of an unoccupied mill site is necessarily speculative, and therefore inadmissible. Nor, is it proper to admit any estimate of annual rental value of the land, made upon the basis of a sale or diversion of the water by the plaintiff's lessees, for the water does not belong to him, and he is entitled merely to its use as it passes through his property.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 111 October Term 1891, Sup. Ct.; court below, No. 424 May Term 1887, C. P.

On April 9, 1887, Paul Clark brought trespass on the case against the Pennsylvania Railroad Company, to recover damages for a diversion by the defendant of the water of a stream known as Clark's run. Subsequently, the record was amended by adding the names of Dixon Bennett and N. J. Bennett, his wife, in right and for the use of said N. J. Bennett, as co-plaintiffs with Paul Clark. The defendant pleaded not guilty and the statute of limitations.

At the trial, on April 14, 1890, the following facts were shown:

Paul Clark, the elder, father of the plaintiffs, died in 1849, intestate, leaving a widow and a number of children, and seised

of one hundred and twenty acres of land in St. Clair township, Westmoreland county, through which ran a small mountain stream known as Clark's run. A grist-mill stood upon that land, and was operated by water power supplied by said stream. About 1853, a written agreement was entered into between the widow and the Pennsylvania Railroad Co., by which the widow granted to the defendant the privilege of taking water from the run by means of a pipe three inches in diameter, until the youngest child should become of age. Under this agreement, the defendant laid a three-inch pipe to the run, at a point on property of Tobias Hull, higher up the stream than the Clark property, and pumped water through the pipe to its station at New Florence, for use in supplying its locomotives. The agreement came to an end by its own terms in 1868, when the youngest child of Paul Clark, deceased, arrived at full age, but the defendant still continued to pump water from the run. About 1870, the three-inch pipe was replaced by one four inches in diameter, and for this a six-inch pipe was substituted about 1883. The latter was still in use at the time of the trial.

The operation of the mill on the Clark property was discontinued in 1872, for the reason, as testimony for the plaintiffs tended to show, that the consumption of the water by the defendant had increased to such an extent as to leave an insufficient supply for the running of the mill. Testimony for the defendant tended to show that the mill was shut down for want of custom. No repairs were made to the mill after 1872, and before 1881 it had fallen into a state of dilapidation. In 1883 and 1884 the plaintiffs, Paul Clark and N. J. Bennett, became the owners of the interests in the farm of the other heirs of Paul Clark, deceased.

Paul Clark, one of the plaintiffs, testified as follows:

" Q. What would have been the value to the plaintiffs in this case, of the use of that mill site and water right there, in 1881, per annum, if there had been no diversion by the defendant ? "

Objected to by defendant's counsel, as incompetent and irrelevant; there being no permanent damage to the mill site or mill seat, the proof of damage can only be the injuries done to plaintiffs' business as millers or farmers, by reason of the diversion of the water for six years before suit brought.

Statement of Facts.

By the court: This is in the line of the inquiry as to how it affected his business on the farm, and mill site there.   Objection overruled; exception.[1]

" A. About fifteen hundred dollars a year.   Q. As it has been diverted by the company through these pipes, of what value was it to the plaintiffs?   A. Not any, as a mill site; without the water."   On cross-examination: " Q. You never attempted to make any repairs on or about the mill since 1872? A. No, sir; I did not make any repairs there since that.   Q. You never made or attempted to make any use of that water power since 1872, did you?   A. No, sir. . . . . Q.  Explain to the jury what use you could have made of this mill site, as it actually existed on the ground, from 1881 to 1887?   A. I do not know as I could have made any use of the ground without the water. Q. I say with the water now.   Do not misunderstand my question: what use could you have made of this mill site as it actually existed there, and you left it there for six years, with the water running through the channel?   A. I could have put another mill there."

Tobias Hull, Jr., testified for the plaintiffs as follows:

" Q. From your knowledge of that stream of water, and of its location, of its character, its volume, what, in your judgment, would the use of that water right on the Clark premises be worth a year, from 1881 to 1887, unaffected by this diversion; that is, if the pipes had not been in there? "

Objected to by the defendant's counsel, as incompetent and irrelevant, there being no preliminary proof that the plaintiffs have any improvements on their premises with which to utilize the water that should have flowed through this stream.

By the court: The objection is overruled; exception.[5]

" A. So far as that run is concerned, it is located close to Florence; it is the best location for a run I know anywhere in the history of runs.   Florence is bound and destined, from every appearance, to become a considerable town, and it is at present; and that water, I could not correctly put an estimate on it, what it would be really worth to water that town and run the machinery that could be run from it."

The court interposed the caution to the witness to recall the question; not as it is a permanent damage to the property, but what would be the worth of that water right from 1881 to 1887,

Statement of Facts.

unaffected by this diversion; what would it be worth to these premises, the Clark property, by the year?

"A. Supposing you come at it this way; I know what I could have turned that water into had it been in the run; and the value of that would undoubtedly be the value of the water. Q. What, in your judgment, would that water right rent for, if there had been no diversion by the railroad company through these pipes, from 1881 to 1887, by the year?"

Objected to by defendant's counsel, as incompetent and irrelevant.

By the court: Objection overruled; exception.[6]

"A. My judgment is, it is worth considerable; I believe it is worth five thousand dollars; actually worth that. Q. For that time? A. Yes, sir. Q. What would it be worth as the water has been diverted through these pipes during that time? A. Well, it would not be worth anything; you could not run machinery. Q. As a water right? A. As a water right; you could not run the machinery. Q. How much damage, in your judgment, have the plaintiffs suffered, by reason of this diversion from 1881 to 1887?"

Objected to as before.

By the court: Objection overruled; exception.[7]

"A. I have stated that, I believe; I answered that before, five thousand dollars." Cross-examination: . . . . "Q. They had nothing on their premises from 1881 down to 1887, by which they could use or attempt to use any water in this channel? A. They had no machinery there in that period, from 1881 to 1887. . . . . Q. Now, you believe the rental value from 1881 to 1887 is five thousand dollars? A. Yes, sir; I think so. Q. The rental value of what? A. Of the water that is taken out of the stream; or, the damage that is done to the stream by taking the water out. Q. Then you go on the presumption that the Clarks were the owners of the water? A. Yes, sir; should have been the owners of it. Q. And whether they had machinery there or not, did not matter? A. No, sir; it did not matter, because the water would rent —I could rent it for more than a thousand dollars a year now, in less than an hour if I was in Florence, I believe. Q. You have told us that you know of no use the plaintiffs made or attempted to make of this water for these six years? A. Yes,

sir; I have told you that. Q. Then, how do you get us to understand that their use of it for six years would have been worth five thousand dollars? A. Because the income of the water would have been worth that; the water would have been worth that; they could have made it out of it. And the longer and the older the town grows, the more they would make out of it; the value of the stream would increase daily, with a very strong ratio, in my opinion, or yearly."

A number of other witnesses testified, under exception as to their opinions, respecting the rental value of the water right on plaintiffs' property.

Lewis Berlin testified for the plaintiffs that the witness, with other parties, made an offer to the plaintiffs, about 1883, of eight hundred dollars a year rent for the water power, for a term of years, with the privilege of buying the property; but the contemplated lease never came to anything, because it was not proposed to take it unless they could get the full privilege of the water, and it did not look very much as if they could get that.

Dr. W. J. Clark called for the defendant:

" Q. What, in your judgment, was the market value of this Clark property, and farm, and mill site and water power, any time between 1881 and 1887? This question is asked for the purpose of showing that the market value of the real estate, including the farm, mill, mill site and water power was not as much as the estimate of damage made by the plaintiffs' witnesses because of the diversion of the water from the mill site for six years before suit brought."

Objected to by plaintiffs' counsel, for the reason that the witness has not shown any knowledge whatever as to the value of real estate, or property, or mill sites, in that neighborhood, and for the further reason that the damage to the fee is not in issue, having been excluded by the court on the presentation of the case on the part of the plaintiffs; that the question tends to show the permanent injury to the fee. The testimony therefore is irrelevant and incompetent.

By the court: The pleadings of the plaintiffs, and the trend of their evidence, is not to recover for the permanent injury to the value of the estate. It is but compensation for the diminished enjoyment or use of the property for a certain number of

Charge of Court below.

years, by reason of the alleged diversion of the water from this stream. Hence, the inquiry relating to the value of the estate itself, or value of the land itself, is not relevant. Were that the question, then the inquiry would be the difference between the value of the land without the alleged diversion, and the land with the alleged diversion; but for the reasons stated, that this is an action to recover compensation for the diminished use of the stream for a certain number of years. The question is not proper.

By the court: Objection sustained; exception.[18]

At the close of the testimony, the court, WHITE, P. J. 40th district, presiding, charged the jury in part as follows:

The defendant here does not deny that if it is found it has diverted in any essential degree the flow of the water from the natural channel, that went over the plaintiffs' lands, the plaintiffs are entitled to merely nominal damages for the purpose of establishing their right, because that will be sufficient for that purpose, and in the future, between those parties, will be conclusive. I say, this is not controverted by the defendant's counsel. It is denied by the defendant, however, that any actual damage or loss has been sustained by any diversion of the water from the plaintiffs' lands for a period of six years prior to the bringing of this suit. . . . .

The question is not, was the water used or diverted of value to the defendant company diverting it; nor whether it was worth anything to the defendant company after such diversion, in their use of it. That is not the question. But, if the diversion occurred, what, if any, actual damage did it do to the plaintiffs? And you will confine your inquiry to discover how that was. In such case, the plaintiffs are entitled to recover all the damages they have actually suffered by reason of the alleged diversion. Such damages can be recovered as are the natural and immediate consequence of the wrongful act of the defendant. So, if the damage sustained, in such case, is the loss of the use of the water for the time, the fair, usual, market value of the use and enjoyment of the water at the place and on the property where the plaintiffs were deprived of its use, is the test. If the amount of the injury can be proved with reasonable certainty and the injury is the natural consequence

of the wrong done by the defendant, the complainants are entitled to compensation therefor. . . . .

The complaint here is against the defendant company, for interfering with the use and enjoyment of the water as it ran through their farm during the period indicated. Now, the law, in cases like this on trial, and with the plaintiffs' pleadings and statements as we have them, will not presume that the wrong, the diversion of the water, will continue ; and therefore, the damages for the interference with the water right are limited to those sustained before the suit, and such as have naturally and directly resulted from the interference with the plaintiffs in its reasonable use. The value of the use of the water, then, during the time the plaintiffs were wrongfully deprived of it is the question here when inquiring about the measure of damages. . . . .

You have heard on the trial, much said about merely speculative damages. These were not allowed, you observed, and this for the reason that they are too uncertain ; depend upon so many contingencies and accidents of business and trade that they cannot be reasonably and fairly computed in the trial of such cases. Hence, we have not before us what might have been done by the plaintiffs in the erection of mills and factories and other enterprises : that is not the question ; they were not there ; they were not actually erected, and what might have been done leads us into the region of mere speculation and uncertainty. We take things as we find them, and in that condition, the inquiry is, what if any damage was done the plaintiffs by any diversion of the water from their land during that time ? Certainly, for the usual domestic and farm purposes, the plaintiffs are entitled to the water ; that is not complained of. But, they were further entitled to the use of the water and its enjoyment as a water power there, for such use as it could be reasonably put to ; and if deprived of that use, and damage resulted to them in being so deprived of its use, then for such injury they are entitled to compensation in damages.

So as to get this matter clearly before the jury in the case, we have heard evidence of its rental value ; not what it might be specially worth to the plaintiffs for their special purposes, because if that were the rule, it might stop all enterprises and improvements. But the question is, what was its market value ?

Charge of Court below.

What was the market value of the water there as it was upon that property, to the plaintiffs during that time? If they have been deprived of the enjoyment of the market value of the property during the period, then that is the measure of damages. . . . . .

The defendant requests the court to charge:

3. There being proof, and plaintiffs admitting that there was no mill or other machinery on their land from 1881 to 1887, you cannot allow any damage for diversion of the water from an alleged mill. There being proof, and the plaintiffs admitting that there was sufficient water in the stream all the time for ordinary farming purposes, you cannot allow any damage for the diversion of water to the injury of the farm. The only alleged injury is to the mill seat or water power. Plaintiffs were not the owners of the water; they were entitled only to its use and enjoyment. There being no proof that plaintiffs had any mill or other improvement on their land, and no proof of any attempt to utilize the water, or proof of permanent injury to the mill seat or water power, we instruct you that no actual damages have been proved, and your verdict cannot exceed nominal damages.

Answer: We have said in our general charge that it was not complained by the plaintiffs that there was such a diversion of the water as to deprive the plaintiffs of the use of it for farm purposes; and, in the absence of evidence showing an insufficiency of water for farm purposes, there can be no recovery of damages for such cause. Then, as to the other clause of the point. We could refuse this point, because it ought to have been separate; but we will answer this second clause. While the plaintiffs were not the absolute owners of the water itself, yet they are entitled to the reasonable use and enjoyment of it going through their premises. In further answer, we say no damage can be recovered here for damage to any mill, or alleged damage to any mill, or improvement, that was not there, or for any permanent injury to the mill seat, or water, as that has not been shown or alleged by the plaintiffs on the trial. Only such damage can be recovered for the injury to the use and the enjoyment of the water and water right, with the property in the situation it was during the period from 1881 to 1887; and such damage can be recovered for such period, by

reason of the diversion, as may be found by the jury from the evidence, under the rules we have given you in our general charge, of what is the measure of actual damage here. Of course damages cannot now and here be recovered for any damage to any mill that was there and had decayed, as shown by the evidence.[19]

—The jury returned a verdict for the plaintiffs for $2,100. The plaintiffs having filed a remittitur reducing the verdict to $1,800, a rule for a new trial was discharged and judgment entered ; whereupon, the defendant took this appeal, assigning inter alia for error :

1. The admission of plaintiffs' offer.[1]

5–7. The admission of plaintiffs' offers.[5 to 7]

18. The refusal of defendant's offer.[18]

19. The answer to defendant's point.[19]

*Mr. Paul H. Gaither* (with him *Mr. J. A. Marchand*), for the appellant.

Counsel cited : Seely v. Alden, 61 Pa. 302 ; Field on Damages, 598.

*Mr. D. S. Atkinson* (with him *Mr. J. M. Peoples*), for the appellees :

1. The defendant injected into the case the idea that the plaintiffs must put their mill in repair and put machinery in it, thus spending a large sum of money, before they could call upon the defendant for damages. This is in the face of the fact that the defendant surreptitiously took and used the water, thereby compelling the abandonment of the mill and destroying the value of the plaintiffs' mill site and water power. If it be the law that the defendant can thus take advantage of its own wrong, the poor and weak are at the mercy of the rich and strong. Many a poor man would be unable to rebuild his mill and assert his rights against powerful wrongdoers.

2. If there is any doubt as to the real and substantial character of the damages sustained by the plaintiffs, or the reasonableness of their recovery, such doubt should be laid to rest finally by the testimony if Lewis Berlin, that in 1883 or 1884 he made them a bona-fide offer of eight hundred dollars per year for this mill site, but was deterred from taking the lease

when he learned of the diversion of the water by the defendant. At one time, we were under the impression that this testimony was possibly incompetent, but under the authority of Horton v. Hall, 1 Penny. 159, we now believe it was properly admissible, even if it had been objected to. Compensation for the loss of that bargain is not of the nature of speculative damages.

3. The proof in this case was overwhelming that the diversion of the water of this stream by the defendant, not only produced a sensible diminution of its volume, but actually so decreased the flow as to compel the total abandonment by the plaintiffs of their mill. Such being the fact, the question of damages, whether nominal or substantial damages should be awarded, was entirely for the determination of the jury upon the testimony. In support of our position we cite : Miller v. Miller, 9 Pa. 74 ; Penna. R. Co. v. Miller, 112 Pa. 34 ; Seely v. Alden, 61 Pa. 302. The fact that the mill was not in operation during the period from 1881 to 1887, was immaterial : Hanover Water Co. v. Iron Co., 84 Pa. 286.

OPINION, MR. JUSTICE CLARK :

The plaintiffs, Paul Clark and others, own one hundred and twenty acres of land, near the western base of Laurel Hill, in Westmoreland county, along the line of the Pennsylvania railroad, and above the town of New Florence. A small stream of water ran through this land, with such a fall as to form the site for a water power for a mill, and a grist-mill had many years ago been erected, which, by an overshot wheel, was propelled by the water of this stream until about the year 1872, when the mill was abandoned, and has since that time been suffered to go to decay and ruin. At the institution of this suit, and for six years prior to that time, it is conceded there was no mill or other structure erected on this site, suitable for operation for any useful or profitable purpose ; nor, during that period was there any effort to operate a mill, or use the water power for any purpose whatsoever.

The Pennsylvania Railroad Company, as early as 1853, under some agreement with the widow of the plaintiffs' predecessor in title, began to divert the water of this stream through a three-inch pipe, from what is known as the Hull dam, which was on the adjoining tract above, owned by the railroad com-

pany, to its water station at New Florence. About the year 1870 it increased the capacity of the pipe to four inches, and in 1883 to six inches. · This suit was brought in 1887, not to recover for any injury to the mill, or to the operation of the mill, for, within the period of the statute of limitations, there was no mill to operate, but for damages to the mill site or water power caused by the defendant's diversion of the water.

The rule of law is uniform and undoubted that every riparian owner is entitled, as an incident to his land, to the natural flow of the water of a stream running through it, undiminished in quantity and unimpaired in quality, subject to the reasonable use of the water by those similarly entitled, for the ordinary purposes of life ; and any sensible or essential interference therewith, if wrongful, whether attended with actual damage or not, is actionable : Mayor v. Commissioners, 7 Pa. 363 ; Philadelphia v. Collins, 68 Pa. 116. This principle applies to some extent whether the stream is public or private : Haupt's App., 125 Pa. 224 ; Lord v. Water Co., 135 Pa. 130. The size and capacity of the stream is, of course, in all cases of this kind, to be considered : Miller v. Miller, 9 Pa. 74. " Every riparian owner," says our Brother Paxson, in Penna. R. Co. v. Miller, 112 Pa. 41, " has the right to use the water of the stream passing over his land, for ordinary domestic purposes ; and if the stream be so small that his cattle drink it all up, while it may be a loss to the lower riparian owner, it is damnum absque injuria. But, where the upper riparian owner diverts or uses the water, not for ordinary domestic purposes, such as are inseparable to and necessary for the use of his land, but for manufacturing or other purposes, having no necessary relation to his use of his land, it is different ; " in such case he has only the right, as against a lower proprietor, to use so much of the stream as will not materially or sensibly diminish its quantity : Wheatley v. Chrisman, 24 Pa. 298.

The stream in question, although steady, was small ; and it is alleged that the six-inch pipe so impoverished the flow of water as to destroy its utility as a water power. The defendant company, as a riparian owner merely, had no right to divert the water from its natural channel, to the prejudice of the rights of others below it on the stream. If the amount of water required to supply its locomotives at this point, and di-

verted by it from the channel of the stream, sensibly or materially diminished the flow, it was bound to buy it, or subject itself to an action for an excessive use or diversion of the water. No matter what were the necessities of the defendant's business, it had no right to convey the water out of its course, to the prejudice of the plaintiffs' rights: Haupt's App., 125 Pa. 211.

We do not understand the defendant to deny that the plaintiffs, under the proofs, are entitled to a verdict for nominal damages. The principle is well established that a diversion of the water of a stream, even without actual injury to a lower riparian owner, legally imports damage, because it is an infringement of a right: Angell on Water-courses, 135. Every injury imports damage, and if no other damage be established, the party is entitled to nominal damages. " This principle, moreover, applies more strongly," says the same author, page 591, " where there is a violation of the plaintiff's right; but the defendant's act, if continued, may become the foundation, by lapse of time, of an adverse right, and hence actual, perceptible damage is not indispensable as the foundation of an action. " Any trespass or nuisance which infringes upon the rights of the plaintiff, or which would abridge his present or potential use of his property, will justify an action, although it cause no present actual damage: Gould on Waters, 401–404, and cases there cited. There is an obvious distinction between the proper use of a stream by a riparian owner, which, although it necessarily modifies the flow, infringes no right of other proprietors, and one which infringes their rights, although it may cause no damage: Miller v. Miller, 9 Pa. 74; Del. etc. Canal Co. v. Torrey, 33 Pa. 143; Graver v. Sholl, 42 Pa. 58.

But what evidence was there to justify a recovery of special damages? The plaintiffs, as we have said, had no mill or other means of using or applying the water power. They had an abundance of water in the stream for all the purposes to which they applied it, or sought to apply it; and it is difficult, in this view of the case, to see how they could have suffered any special damage. If they had it in contemplation to erect a mill, they could have vindicated their right by successive actions of trespass; or, after establishing their right at law, if it were at all disputed they might have enjoined its invasion by

proceedings in equity.   They might perhaps have laid grounds
for special damages, by giving notice of their purpose to avail
themselves of the water power.

The plaintiffs' theory as to special damages goes upon the
apparent assumption that the defendant has appropriated some-
thing which was theirs, and for which he should pay the price.
But the plaintiffs did not own the water which ran through the
defendant's pipe; indeed, it was diverted from its course be-
fore it reached the plaintiffs' land, and the plaintiffs could in
no sense be said to have any title to the water.   As riparian
owners, they had the right, as we have said, to have the water
of this stream run through their land in its natural channel,
without any material impairment of its flow.   They had a right
to the use of the stream as an incident to the land for ordinary
purposes, and also for any extraordinary purpose to which they
might choose to apply it, provided such extraordinary use did
not materially diminish its quantity or impair its quality.
They might have chosen to erect a mill, or to lease the site to
some other person to erect a mill; and in either case, upon
notice from the plaintiffs, the railroad company would have
been obliged to cease the diversion of the water or be subject
to a claim for special damage ; but, as long as the diversion of
the water did not do them any actual injury, they had no claim
for special damages.   The company was of course at all times
liable to an action in vindication of the plaintiffs' right, but
not for the recovery of actual damage until an actual injury
was done.   The mill site was of no use to the plaintiffs, or to
a lessee, or to any other person in the absence of a mill, or
other useful mechanical construction to which the water might
be applied; and until such a structure was erected, or proposed
to be erected, how could the diversion of the water cause ac-
tual injury?   Had the diversion ceased, and the full flow of
the water been restored, how could that have profited the
plaintiffs?   They had no means of utilizing the water, and
therefore they suffered no actual loss from its diversion.   If
the plaintiffs had owned the water, they would be entitled to
recover its value, but they were only entitled to the use of it
as it passed through their property.

It is said that they might have leased or rented the water
power, and the rental value is therefore the proper measure of

damages ; but the use of the mill site, either by the owners, or
a tenant or lessee of the plaintiffs, is dependent wholly upon
the construction of a mill, and it is extremely improbable that
a lessee would undertake the expenditure upon a mere tenancy
from year to year.   The estimated annual value of the mill site,
as such, and independent of the land, is fanciful, conjectural,
and speculative, for it is based upon its value as applied to some
sort of a mill.   It was variously spoken of by the witnesses as
a suitable site for a grist-mill, or a saw-mill, for a sash and door
factory, for a coach or wagon factory, or for a woolen factory ;
but all these suggestions of annual rental value are made upon
the assumption that a mill, factory, or other structure would
be built, in order to utilize the advantages which the site offers.
The true rule in such a case is to estimate the damages sus-
tained from the diversion of the water, in the use of the land for
the purposes for which for the time the land was used, or for
which it would have been used, but for the refusal of the de-
fendent on due notice to remove the pipe.   The injury received,
if any, was not to the mill site, for there was no mill, and the
site was useless without a mill.   It was to the tract as a whole.
It was competent, therefore, for the plaintiffs to introduce
evidence to show any actual injury they suffered, within the
period of the statute, in the enjoyment of their land from the
diversion of the water ; and, as a means of computation, they
might show that the annual rental value of the land was from
this cause reduced, but the annual rental value of the mill site
is necessarily speculative, and therefore inadmissible.   Nor was
it competent to admit any estimate of annual rental value, made
upon the basis of a sale or diversion of the water, for the water
does not belong to the plaintiffs.   As riparian owners, they were
entitled merely to the use of it, as it passed through their prop-
erty.

> The judgment is reversed, and a venire facias de
> novo awarded.