# ADAMS et al. v. PORTAGE IRRIGATION RESERVOIR & POWER CO. et al.

No. 5882. Decided October 18, 1937. (72 P. 2d 648.)
Rehearing denied June 28, 1938.

2

4

For opinion on rehearing see 95 Utah 20, 81 P. 2d 368.

*Thatcher & Young,* of Ogden, for appellants.

*B. C. Call,* of Brigham, for respondents.

LARSON, Justice.

Plaintiffs, a group of sheepmen, owners of grazing lands in Box Elder county, Utah, instituted this action in the district court of Box Elder county against the defendants, Portage Irrigation, Reservoir & Power Company, a corporation, hereinafter called the Company, the Town of Portage, a municipal corporation in Box Elder county, hereinafter referred to as the Town, and the Works Progress Administration, to establish the right of plaintiffs to the use of part of the waters of certain springs in Portage Canyon for culinary and stock watering purposes and to enjoin defendants from interfering with plaintiffs' use thereof. The ultimate facts are not seriously disputed, but the deductions and conclusions the trial court made therefrom are questioned and assailed. The salient facts follow:

The Town of Portage is an agricultural community, with a population of between 500 and 600 people, in the northern part of Box Elder county. The defendant Company, made up primarily of residents of the Town, regulates and distributes for irrigation purposes, along with other waters, those from Portage Canyon. The Town in 1921 established a reservoir and installed pipe lines from the lower springs in Portage Canyon for supplying its inhabitants with water for culinary and domestic purposes and the watering of lawns and livestock. Higher up near the head of the canyon, the plaintiffs severally own certain lands, some on the Portage side of the mountains and some near the top but over

the divide, totaling about 13,520 acres, situate mostly in township 14 north, range 4 west, Salt Lake meridian, and suitable only for spring and fall grazing. On and over these lands they grazed, during lambing season in the spring and for a time in the fall, collectively, for over 40 years, varying from year to year, from 10,000 to 15,000 head of sheep. In the spring, while there are snow patches and drifts, the sheep water from the melting snows and from small ponds or reservoirs constructed by plaintiffs by making dams across the draws or swales.

What is known as the upper springs in Portage Canyon, the waters involved in this action, arises in sections 9, 10, 16, and 17 in township 14 north, range 4 west of the Salt Lake meridian, about 4 miles from the town and three-fourths of a mile upstream from the intake springs of the Town culinary system. Some of the springs arise upon lands of plaintiffs, Adams, in sections 10 and 16 and some of the springs are on the lands of one Harris, not a party to the action. The waters from these springs, about one second foot (cubic foot per second), except as plaintiffs used it for camp purposes and watering sheep, flowed down the canyon about 4 miles where the Company diverted it for irrigation purposes. In November, 1935, the Town secured approval of the Works Progress Administration of an allotment of $3,941, with which the Town proposed to gather the water of the upper springs into pipes and conduct it down the canyon 4,000 feet to the culinary water system intake box through an 8-inch vitrified clay pipe. By agreement with the Company, the Town in return was to have 20 gallons per minute flow to add to its lower spring system for culinary purposes; the rest of the stream to be released from the pipe into ditches of the Company. This would shut the spring area and creek dry and no water would be available for the camps or sheep of plaintiffs. When the Town undertook to proceed with the construction, plaintiffs brought this action. The trial court entered a decree permitting the Town to proceed with its work, constructing intake boxes and laying pipes,

but required the Town to install, at the upper springs, or headworks, a 4-inch standpipe from which plaintiffs could draw water for camp purposes and for watering sheep to the number of 15,000 head at not to exceed 3 gallons per day per head, when there was no snow water available during the spring and fall and when their sheep were grazing upon their lands, but not between July 1st and October 1st of each year. The defendant Works Progress Administration made no appearance in the action and no judgment was made in regard to it. The other two defendants, the Town and the Company, severally appeal assigning errors, and plaintiffs cross-appeal and assign cross-errors.

Appellants' assignments may be grouped into the following propositions: (1) Error of the court in denying defendants' motion to strike certain paragraphs of plaintiffs' complaint. (2) Errors in the admission and rejection of evidence. (3) Insufficiency of the evidence to support certain findings of fact. (4) That the evidence and findings do not support the judgment. (5) That the judgment is void for uncertainty, that it is so uncertain it cannot be enforced. We shall discuss these assignments in their order.

(1) Defendants, before answering, filed a motion to strike several paragraphs of plaintiffs' complaint as sham and redundant. These paragraphs referred to the Works Progress Administration and its activities. The matters alleged in those paragraphs have no relationship to the issues and matters in dispute between plaintiffs and the appealing defendants. They could only serve the purpose of matters of inducement by showing that the defendant Town was financially able to carry into effect its threat to pipe the waters and interfere with plaintiffs' use thereof. Motions to strike pleadings or parts thereof are addressed to the judgment and discretion of the trial court. A ruling thereon, except under circumstances which amount to a clear abuse of discretion, will not be disturbed on appeal. 5 C. J. S., Appeal and Error, 484; *Gottschalk* v. *Village of Posen*, 252 Ill. App. 352; *Frankel* v. *Hudson*, 271 Mo. 495,

196 S. W. 1121. The rule is well stated by the Kansas court in *Nelson* v. *Schippel*, 143 Kan. 546, 56 P. (2d) 469, 470, as follows:

> "It has been frequently held motions to strike, to make definite and certain, and to separately state and number rest in the sound discretion of the trial court from which rulings ordinarily an appeal does not lie. Unless it is shown such alleged error prejudiced the substantial rights of a party, it will not be reversed."

In the instant case, the order did not affect anyone. The Works Progress Administration did not appear, no judgment was made with respect to it, and no order or judgment as to appellants was made which was in any way founded upon the allegations covered in the motion to strike. The order refusing to strike did not determine the action, affect substantial rights of the parties, nor the progress of the trial. It is therefore not error.

(2) Appellants' second assignment as to rejection of evidence likewise cannot be reversible error. They produced a former justice of the peace, without records, and attempted to prove by him that the Town had made arrests to prevent pollution of the waters which the Town used as culinary water in ditches before the installation of their pipe lines in 1921. Such testimony, if received, would not go to questions of water rights between the parties, nor of adverse user, unless it tended to show use by the parties arrested (one of plaintiffs' herders) of the waters, which would be against appellants. The right of a municipality to protect its water source from pollution may be invoked as freely against people with superior rights on the stream as against those who have no rights. Furthermore, there is no dispute between the Town and the plaintiffs as to the ownership or right to use the waters in question. The Town has no water rights in the upper springs except such as it may purchase from the Company if it installs its pipe line. As far as water rights are concerned, the dispute lies between the defendant Company and the plaintiffs.

(3) Appellants' third point is that the evidence does not sustain a finding that for 40 years the plaintiffs and their predecessors have grazed more than 10,000 sheep on their lands. Without setting out the evidence in detail, we have examined the record and it shows sufficient facts to sustain the court's findings. Several witnesses testified as to the number of herds and the number of sheep per herd, 2,500 to 3,000, the parties grazed during the years and period involved. Such numbers, as far as given, total over 10,000 per year. In the years that figures are not given, the testimony is that the herds were about the same as the specified years. It may have been better practice to find more in detail as to each plaintiff, but, under the issues as formed, such finding is not necessary. The record sustains the finding and the same must stand.

Complaint is made as to the finding that plaintiffs had no other source of water for their sheep except snow water. The testimony shows there was no other water except as the snow water was caught in small holes or reservoirs for a few days in wet seasons. Throughout dry seasons and during the time in all seasons when plaintiffs used the springs, these ponds held no water.

(4) Appellants' fourth point brings us to the real crux of this case, and presents the point of law about which the dispute and the cause pivot. Can one acquire a right in a stream or spring to take therefrom water for household use and to water his animals at the spring, without actually diverting the water or interfering with its flow other than by consuming part of it? In the instant case this question presents two aspects: First, the right of a landowner, upon whose land a spring arises, to take therefrom, without interference, water for domestic (household) use and to water his livestock without making an actual diversion of the flow from the natural channel. Second, the right of users on grazing range to water their livestock at springs or streams flowing in natural channels, without interference, without making a statutory appropriation.

The situation of plaintiff Hyrum Adams is somewhat different from any other plaintiff on the facts. He owned the lands (section 16) where some of these springs arose, and was, and had been for 12 years, the lessee of section 17 where other springs were situate. He grazed regularly, year after year, on these lands. In fact, they were his lambing gounds. He kept his camp near the spring for considerable periods of time and through June and in the fall watered his sheep rather regularly and more frequently at the springs.

Waters in this state are of two classes, public waters and private waters. The latter class is not only subject to exclusive control and ownership, but may be used, sold, or wasted. It consists of such waters only as have been reduced to actual, physical possession of an individual by being taken into his vessels or storage receptacles. It is private property and may be the subject of larceny. Public waters, on the other hand, are not the subject of larceny. The title thereto is in the public; all are equal owners; that is, have coequal rights therein, and one cannot obtain exclusive control thereof. These waters are the gift of Providence; they belong to all as nature placed them or made them available. They are the waters flowing in natural channels or ponded in natural lakes and reservoirs. The title thereto is not subject to private acquisition and barter, even by the federal government or the state itself. In the interests of order in the social and economic set, rights to the use thereof may be granted to bodies or individuals as provided by law, but no title to the corpus of the water itself has been or can be granted, while it is naturally flowing, any more than it can to the air or the winds or the sunshine. "Such water," says Blackstone, "is a movable, wandering thing," here today and there tomorrow, like wild birds on the wing. But one may obtain a right to the use thereof. He may acquire a right to take or divert the water from the stream or lake and thus reduce such part into his exclusive possession and control, in his ditches, canals, reservoirs, buckets, or other receptacles. Having thus captured the "wild," he acquires

a property right therein as long as he maintains his capture, his possession. Kinney on Irrig. & Water Rights (2d Ed.) vol. II, §§ 455 and 772. As said by Mr. Justice Field in *Spring Valley Water-Works* v. *Schottler,* 110 U. S. 347, 4 S. Ct. 48, 62, 28 L. Ed. 173:

"The wild bird in the air belongs to no one, but when the fowler brings it to earth and takes it into his possession, it is his property. * * * So, when the fisherman drags by his net fish from the sea, he has property in them, of which no one is permitted to despoil him."

So it is with water. While it is flowing naturally in the channel of the stream or other source of supply, it must of necessity continue common by the law of nature, and therefore is nobody's property, or property common to everybody. And while so flowing, being common property, everyone has equal rights therein or thereto, and may alike exercise the same privileges and prerogatives in respect thereto, subject at all times of course to the same rights in others, and to the special rights to divert and use which have theretofore attached, vested or been recognized by law. Said Mr. Justice Moffat in *Wrathall* v. *Johnson,* 86 Utah 50, 40 P. (2d) 755, 766:

"Water from the source to the point where the appropriator or user captures or diverts it into his conveying channels or containers is publici juris; and others have the same right to use it as the appropriator, so long as they do not interfere with the appropriator's use, by diminishing his quantity or impairing the quality."

See, also, *Salt Lake City* v. *Salt Lake City Water & Electrical Power Co.,* 24 Utah 249, 67 P. 672, 61 L. R. A. 648. And so, while water is still in the public, everyone may drink or dip therefrom or water his animals therein, subject to the limitations above noted as to the rights of the appropriator as fixed by law to his quantity and quality. This right of the public, as well as the rights of the appropriator, were confirmed by the State Constitution in article 17:

"All existing rights to the use of any of the waters in this State for any useful or beneficial purpose, are hereby recognized and confirmed."

The right which the appropriator obtains, as a limitation on the rights of the public use, that is, the right to take waters otherwise publici juris into private control, exists only when exercised in the manner prescribed by law. That right must be exercised by a statutory appropriation since the enactment of the statute governing such matters, or by a diversion from the natural channel prior to the enactment of statutory regulation. But in either event, there must be a diversion from the natural channel or an interference with the natural free flow, for storage, effected by the work, labor, or art of man. Then, and not until then, can the appropriator assert any rights in and to the water itself. It follows that as long as he receives at his point of diversion the quantity and quality to which his appropriation entitles him, he as an appropriator, has no control over or concern with what anyone else may do on or with the stream, or what uses, if any, they may make thereof. True, courts have said the appropriator has an interest in the stream from his point of diversion to its source, but this interest, other than as a part of the public, is merely the right to have water, in quantity and quality to satisfy his appropriation, come to his point of diversion. Coincident with this right, on his part, to insist as against the public that his quantity come to him, is the right of the public to insist that no more than his quantity come to him. And this right in the appropriator is not absolute and without limitation. The right is only a preferential use, commonly called a priority, a right, as against subsequent appropriators, to first divert and use beneficially the quantity or volume of water he has theretofore diverted and used beneficially and economically, but not exceeding the quantity or volume fixed by his decree, if his rights have been adjudicated, or his certificate, if he has made his appropriation since the enactment of the statutory methods in 1903. And where his quantity has not thus been determined and fixed he is limited to the quantity he has theretofore diverted and used beneficially and economically. More than this he cannot claim.

Any excess in the stream, or any increase therein over his preferential right, is subject to appropriation or to the general rights of the public therein.

"Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state." Section 100-1-3, R. S. Utah 1933.

And even though the flow be within the quantum of water to the use of which an appropriator has a preferential right, during any time it is not being used beneficially and economically, it still is, remains, or becomes publici juris, subject to all common rights of the public and to appropriation and use by another, for the appropriator's right is merely a preferential right to the beneficial and economical use of the water up to his given quantity.

The right of respondents to take water for camp purposes from Portage creek and to water their sheep therein is a lawful right, recognized by the Constitution and the statute, unless in so doing they are appreciably decreasing the quantity or deteriorating the quality of the waters to the use of which appellants have a priority, a preferential right. The Town of Portage on the record has no right in or to the waters involved in this action. The Town's culinary supply comes from other springs three-quarters of a mile down the canyon from the springs here involved. Any rights the Town may have in these waters must rest upon contracts of purchase, or for use, made with the Portage Irrigation, Reservoir & Power Company, one of the appellants. The Town can neither take, receive, or demand any more than the Company could do. We shall, therefore, examine the rights as between the respondents and the Company. The rights of the Company in the waters of Portage Canyon are based upon an appropriation, diversion, and use more than 70 years ago. There is, therefore, no record in the office of the state engineer of their appropriation or rights; no certificate has been issued therefor; no adjudication has been made as to quantity diverted or used, and no records

exist from which such fact can be determined. Their rights, therefore, whatever the quantity in gallons or cubic feet of flow, are limited, and to be determined, when necessary, by the quantity they have through the years diverted and used beneficially and economically. The trial court found as a fact that appellant Company for more than 40 years had diverted and used, beneficially and economically, the entire flow of Portage creek at its point of diversion; that it had used the entire natural, normal flow of the creek, except such waters as had been used by the respondents, and which the court found respondents owned and had a lawful preferential right to use as against appellants. This action came about, not from any effort of plaintiffs to assert a right to waters which defendant Company has been diverting from Portage creek, nor from an effort of defendants to protect any waters they have heretofore diverted or used beneficially, but in the effort of defendants to bring new, further, and additional waters to their point of diversion, and the doing of which plaintiffs think infringes their rights and takes from them valuable rights which depreciates in an almost confiscatory way their private lands. It is defendants' plan and purpose to go up the natural channel far above their point of diversion and by means of excavations, cement boxes over springs, and pipe lines, convey all the water of the upper springs area down the canyon for three-quarters of a mile and thus save and increase the flow and amount of water at their point of diversion, thus recovering more water than they have heretofore diverted from the stream or beneficially used.

If this be new or added water, no right thereto can attach or be asserted until after an application has been filed in the office of the state engineer. *Deseret Live Stock Co.* v. *Hooppiania*, 66 Utah 25, 239 P. 479; *Bountiful City* v. *De Luca*, 77 Utah 107, 292 P. 194, 72 A. L. R. 657. If it be considered as merely a change in place of diversion, it also must start with an application in the office of the state engineer, and notice must be given so interested

parties could be heard and their rights protected. Appellants pleaded in their answer, and testified that the proposed works would save from evaporation and seepage a considerable quantity of water and the Company would permit the Town to divert into its pipe line a part thereof in consideration of the Town doing the work and furnishing the money to effect the savings. No application was made to the state engineer either to appropriate this water or to change the point of diversion of their water. It is admitted that defendants' works would inclose the entire stream now flowing in its natural channel, thus excluding everyone (the public) from enjoyment of all rights therein. When a person seeks to do this, he has the burden of showing his right so to do, and this burden appellants did not carry.

Furthermore, we may say there is no evidence in the record that the use respondents made of the waters at the upper springs either appreciably decreased the quantity or deteriorated the quality of the waters at appellants' point of diversion. Appellants, having admitted an attempt to interfere with and prevent respondents and the public generally from enjoying their rights incident to waters flowing in their natural channel, and having failed to show any superior right in themselves to the waters, any rights which would limit or curtail the rights of the public, are not in a position to complain because of the decree of the court.

The trial court went further than this, and found that, as to defendants, the plaintiffs had acquired a right to the use of a portion of waters of the upper spring by adverse user for over 40 years. (Finding of fact No. 20.) Appellants assail this finding as not supported by the evidence. Let us examine the record. At the outset, counsel for appellants (defendants), in response to a question by the court, stated that he did not contend that plaintiffs could not obtain by adverse user a right to water their sheep, but merely that they had not done so. Counsel was correct in the legal proposition involved in the first part of this statement.

*Patterson* v. *Ryan,* 37 Utah 410, 108 P. 1118; *Holman* v. *Christensen,* 73 Utah 389, 274 P. 457; *Robinson* v. *Schoenfeld,* 62 Utah 233, 218 P. 1041; *Steptoe Live Stock Co.* v. *Gulley,* 53 Nev. 163, 295 P. 772; *Hammond* v. *Johnson,* 94 Utah 20, 66 P. (2d) 894.

Plaintiffs, by a procession of witnesses, Doman, Schmalz, Hyrum Adams, Willard Petersen, Verlo Petersen, D. H. Adams, Cotter, and others, produced evidence that these parties and their predecessors in interest had come into this territory from 1898 to 1903, and, continuously from that time to the present, had grazed these lands and during May, June, and October, and particularly in June, had watered these sheep at these springs; that commencing in 1905 they had acquired private ownership of these lands; that they had paid as much as $5,000 a section for the lands; that without access to these waters the lands would lose half their value and the sheep industry there would be ruined; that these were the lambing grounds after the sheep must leave the winter desert and before they could go onto the summer range (the national forests) on July 1st; that after the snow melts there is no other water available; that during all the years since about 1903, the plaintiffs have run approximately the same number of sheep on these ranges and had watered them at these springs; that sheep must be watered, when there is no snow, at least every three days; that a sheep would drink from 2 to 3 gallons of water every third day; that no one had ever interrupted their use of the water or forbidden them to water at the spring, except that before the Town put in its culinary pipe line in 1921, the Town, not the Company, had at times complained, not against the use of the water, but against the pollution of the supply while the Town took its drinking water from the stream. In opposition thereto, defendants merely offered negative evidence, to the effect that when their witnesses were up at the springs from time to time they had not seen the sheep of anyone but Adams watering at the springs. The court saw the witnesses, heard them testify, and from the record found

for plaintiffs on that issue. We think the finding is consistent with the record and we shall not disturb it.

There is another point in the cause which should foreclose appellants. The decree actually gives or permits them more than they are entitled to under the record. The court found as a fact (and this finding is not questioned or assailed by appellants), that parts of these springs were on land owned by respondents Adams. Upon these lands appellants planned and threatened to go to dig ditches, make excavations, place cement boxes, and lay pipes to carry off the water. This they could not do except by permission of Adams or by process of eminent domain. They do not claim to have right by either method. Furthermore, the court found respondents had a right in these waters. The court in the exercise of a proper discretion to secure regulated use for economy in use, and prevent loss or waste of water, permitted appellants to go upon Adams' land and install their works, but directed that a 4-inch standpipe be installed through which respondents could take water sufficient for their camp and sheep, shutting off the pipe when the sheep were watered. This protects appellants and gives them all waters they can save by their work and pipeline, and limits respondents to the actual needs, that is, to a most economical use. It also protects and saves from great damage and loss, if not from annihilation, the sheep industry, and does very substantial justice between the parties.

In the interest of further conservation of the very limited water supply, the decree should be modified in the following particulars: Should defendants desire to install a water trough into which the water can be turned from the standpipe for watering the sheep, instead of having it flow down the old creek bed, they may do so; the size of such trough, if the parties cannot agree upon the same, to be fixed by the court upon application of either party, on the record as made, or upon further evidence to be taken as to the proper size and location necessary to enable plaintiffs to water their sheep with a reasonable minimum of difficulty.

Respondents cross-appealed, assigning errors in two particulars. They are scarcely insisted upon by counsel. Neither the evidence nor the law would justify the provisions in the decree which the assignments are intended to urge should have been made and there was no error in the court's action in denying the same.

As above modified, the judgment and decree is affirmed. Each party to bear their own costs.

FOLLAND, C. J., and HANSON, and MOFFAT, JJ., concur.

WOLFE, Justice (concurring in results).

I concur in the results. The result reached is a fair and practical legal solution of a practical problem involving the use of water. But I think it possible to come to the same result without any commitment as to some of the fundamental questions which the opinion propounds. I cite the question whether a party may obtain a diligence right, either without use in connection with land or without diversion in connection with stock watering by merely watering stock at the stream or perhaps himself or his family at the stream when the dipping or the drinking from the stream is not in connection with the maintaining of a home or running cattle on land in respect to which water is used. Nor am I prepared to say in this case that a user is entitled to not only the same quantity of water but water of the same quality. He may be entitled to water of the same or better quality for drinking or culinary purposes, but for irrigation, water which will as well serve his irrigation perhaps may be substituted. I think, inadvertently, we may have, by our expressions in other cases, worked in one of the elements of the riparian rights doctrine. At least in this case it is not necessary to intimate that he has a right to receive waters of the same quality which he has appropriated for all purposes of appropriation. For the reasons stated I concur in the results reached, but not in all the propositions laid down seemingly to reach that result.