328 P.2d 175

**WEBER BASIN WATER CONSERVANCY DISTRICT, Plaintiff and Respondent,**

v.

**John R. GAILEY and Frank Bohman, et al., Defendants (Frank Bohman, Appellant).**

No. 8478.

Supreme Court of Utah.

July 2, 1958.

J. Lambert Gibson, James E. Faust, Salt Lake City, for appellant.

Young, Thatcher & Glasmann, Ogden, Homer Holmgren, Fisher Harris, Salt Lake City, amici curiae.

Neil R. Olmstead, Ogden, E. J. Skeen, Salt Lake City, for respondent.

CROCKETT, Justice.

A rehearing was granted in this case to give further consideration to this important question with respect to water diversion: Does an owner of land adjacent to a stream have the right to insist that the stream continue to flow in its natural channel undiminished for the purpose of maintaining lateral support to keep percolating waters within the soil of his land?

We refer to this case as heretofore reported,[1] and in addition thereto, state briefly the facts essential to our further discussion of the problem involved.

Plaintiff, Weber Basin Conservancy District, is engaged in an extensive water conservation program by constructing a series of storage reservoirs along the Weber River. This river is part of the westward drainage of the Uintah Mountains, where there is heavy snow and rainfall; it courses westward through mountain valleys and

1. 5 Utah 2d 385, 303 P.2d 271.

through the Wasatch Range via Weber Canyon into the basin of Great Salt Lake. The purpose of the plaintiff's reservoirs in the higher mountain valleys is to store the water of the river and to transport it in canals and aqueducts to be used for irrigation, culinary and industrial uses in Morgan, Weber, and Davis Counties, principally, west of the west face of the Wasatch Mountains where there is greater concentration of population and industry.

Defendant owns a tract of about 28 acres of land in Morgan County lying just west of the Weber River about 35 miles downstream from plaintiff's Wanship reservoir. Its Gateway Canal, carrying water from the river, traverses the west portion of the defendant's land. He has received compensation for the part of his land actually taken for that purpose, and there is no disagreement about his right to it. The controversy here devolves upon the defendant's claim that he is entitled to recover for damages to his remaining land by reason of the diminished flow of the river because of impounding it in the reservoir. His appeal challenges the trial court's rejection of his claims for such damages.

On the initial hearing before this court the order was to remand with directions for the district court to retain jurisdiction until such time as the canal was completed to determine the defendant's damages, if any. Because of the possible misinterpretation which might be placed upon that order by assuming that damages may be recovered under such circumstances, and the possible far-reaching effect which the ruling upon the issue here involved may have upon the development and use of the water resources of this state, we concluded to grant this rehearing to further examine the question.

The physical situation upon which the defendant postulates his contention for damages is thus: As the Weber River flows along the east side of his land, the waters spread out through his subsoil, and the river itself acts as a "buffer" to prevent drainage, so that the water table in his subsoil rises and falls with the rise and fall of the water level in the river; in fact there is a large unseen volume of subsurface water coursing slowly down the river valley underneath and alongside the running stream; if the water of the river is impounded in the reservoir above, it will diminish and at times entirely remove the water from the river; this will naturally have its effect upon the subsurface waters below; and further, the depleted riverbed itself, being lower than the surface of defendant's land, will then in effect act as a drain to its subsurface waters. Defendant also avers that the river presently affords his land the benefit of some direct irrigation in the spring by overflowing and flooding his land.

Defendant maintains that the subsurface waters in his soil are part of the land itself and therefore his private property,

and that any diversion of the river which would lower the water table removes moisture from his land is a "taking of and a damage to" his property.

The controversy here brings two principles into direct conflict:

The one, urged by the defendant: that the sovereign power of eminent domain cannot be used to take or to damage property without just compensation;[2] wherefore he avers that he is entitled to be compensated in damages.

The other, by the plaintiff: that having established its right to use waters of the river in accordance with law, it should have the uncontrolled right to use them.

Just how this conflict is to be resolved depends upon basic policy considerations in regard to rights to the use of water. For the purpose of exploring the question it is appropriate that we briefly look at the historical development of the use of water and the rules of law applicable thereto in our state. Prior to settlement by the Mormon pioneers in 1847, it was regarded as a dry and arid desert region with only sparse vegetation.[3] The development of the economy of the state has, from the beginning, depended entirely upon the ingenious and determined efforts of our people to conserve and make the best possible use of all water resources. We deem it not amiss to observe that in doing so they have achieved some claim to leadership in the field of irrigation and take justifiable pride in having their achievements referred to as causing the once unpromising desert wilderness to "blossom as a rose."

Even before the arrival of the main body of Mormon pioneers in Salt Lake Valley July 24, 1847, a group of eight horsemen led by Orson Pratt rode into the valley, and seeing the desert soil crying for moisture, diverted the stream of City Creek over the dry valley floor to condition it for the planting of crops.[4] This set the pattern which has been followed ever since because water has always been the principal limiting factor to our growth and development. It is an indispensable resource which cannot be replaced nor substituted for, and there is no way, presently at least, of augmenting it; whereas population is always increasing. For that reason the conservation and efficient use of water has become increasingly more important, not only to agriculture, but to our growing industry, and in fact, to every phase of life. Most of the streams and natural water sources of the state have

2. Sec. 22, Art. I, Utah Constitution.
3. Typical of the impressions of the early explorers is the rumored statement of the famous trapper and scout, Jim Bridger, who, in discouraging prospects for settlement in Salt Lake Valley, told Brigham Young that he would give a thousand dollars for the first bushel of corn raised there. See B. H. Roberts, Comprehensive History of L.D.S. Church, Volume 3, pp. 200, 201.
4. Andrew Jenson, L.D.S. Church Chronology, p. 33.

now been appropriated, and the likelihood is that all will be before long. Consistent with the necessity of meeting the exigencies resulting from the short supply and the increasing demands for water it has always been the fundamental policy of our water law to encourage the putting of water to the highest beneficial use and to keep it so employed.

A concomitant of the considerations just stated and the policy emanating therefrom is that Utah, in common with most of our western states, found it necessary and desirable at an early date to repudiate the common law doctrine of riparian rights,[5] which originated in England and is still extant in eastern states. It gives recognition to certain rights of property owners along the banks of the stream in the waters there flowing. The aspect of that doctrine of interest here is that the owner of land contiguous to a stream is entitled to its continuous flow by or through his property, undiminished in quantity and quality.[6] There are natural advantages to property along the banks of a stream, but to insist that the streams be permitted to flow to preserve them is too extravagant a luxury with this precious resource, and the advantages are far outweighed by the more important policy of putting all water to its highest use.

Out of necessity have grown the basic rules: that water belongs to the public; and that the right to use it is derived and maintained by putting it to a beneficial use, as has been repeatedly declared in the adjudications of this court.[7] This has also been enacted into statute: "beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state."[8] The historical development of our water law indicates that rights to the use of water are firmly grounded upon three things: (1) initiative in discovering useable water resources, (2) industry in taking overt action to bring the water under control for the purpose of putting it to a beneficial use, and (3) diligence in continuing the use thus established. The foregoing constitute the only recognized foundation upon which rights in water can be created and maintained.

The doctrine of public ownership of water and the manner of acquisition of rights therein by appropriation and use were developed initially and principally in connection with surface waters, but have also been

5. Stowell v. Johnson, 7 Utah 215, 26 P. 290; Wrathall v. Johnson, 86 Utah 50, 40 P.2d 755, 774. See, also, Sec. 73-3-1, U.C.A.1953.
6. Clark v. Pennsylvania R. Co., 145 Pa. 438, 22 A. 989.
7. Patterson v. Ryan, 37 Utah 410, 108 P. 1118; Bishop v. Duck Creek Irr. Co., 121 Utah 290, 241 P.2d 162 and authorities therein cited.
8. Sec. 73-1-3, U.C.A.1953; see, also, Sigurd City v. State, 105 Utah 278, 142 P.2d 154.

made to apply to underground water.[9] There is now no question but that under decisional and statutory law both underground waters in defined channels and also in artesian basins are subject to appropriation in a similar manner, see Wrathall v. Johnson.[10] Following the Wrathall case the 1935 Legislature amended the governing statute. It seems clear that the purpose was to declare all waters in the state, whether above or below ground, to be public waters and subject to appropriation regardless of whether flowing in defined channels.[11]

In the case Riordan v. Westwood,[12] (1949) Justice Wade made a comprehensive survey of the pertinent water law and of the effect of the amendment just referred to. The statute was held valid, and as to its effect he said:

"* * * the legislature intended, as far as it was legally possible, to declare all waters of the state whether under or above the surface of the ground and whether flowing or not, to be public property subject to the existing rights to the use thereof. * * *"

It is true that there is indication in that opinion that underground water diffused through the soil is subject to private ownership by the owner of the land. It is to be noted that there is some difficulty encountered in reconciling that concept with Sec. 73–1–1, U.C.A.1953 above referred to. We do not deal with that conflict because it is not presented in this case. It seems that the landowner does have some rights in the waters naturally occurring in his soil in the right to use and exercise dominion over them while they remain therein; and we do not doubt that no one from the outside could, in effect, pirate the waters, by making an artificial canal or other excavation for the purpose of draining the land, without being held responsible. We are not here concerned with such a situation. Here the plaintiff simply proposes to impound in a reservoir the water of the Weber River to which it has, in the manner recognized by law, established its right to use.

It is to be noted that there is a distinct difference between this case and that of Riordan v. Westwood, supra, where the defendant actually went upon the plaintiff's ground and dug a trench for the purpose of collecting the waters diffused in the soil. Assuming the correctness of the idea therein espoused that: "* * * while they

---

9. Utah Laws, Ch. 100, Secs. 34, 47 (1903) required an application to obtain a right to the use of the water "above or under the ground," flowing in defined channels.

10. Wrathall v. Johnson, 86 Utah 50, 40 P.2d 755; Justesen v. Olsen, 86 Utah 158, 40 P.2d 802.

11. S.L.U.1935, Ch. 105, Sec. 1; Sec. 73–1–1, U.C.A.1953.

12. 115 Utah 215, 203 P.2d 922, 927.

[percolating waters] are in his [the owner's] land they are a part of [his] soil and belong to him, and he can do with them * * * as he sees fit", that would not resolve the issue in favor of the defendant here. It was pointed out with particularity that the dominion the plaintiff had over the waters extended only while they were within the confines of her own property: "The owner of the land does not have any right to the waters percolating through the soil before they come into his land nor after they depart therefrom * * *." 13

The plaintiff's canal was dug upon ground taken from the defendant by condemnation. The canal itself is on the higher western portion of his land and cannot have the effect of draining it. The claimed drainage about which the defendant has apprehensions is to come about by the removal of the Weber River. The fact that part of it will be diverted through this canal is a mere coincidence. It could be run off in any direction with the same effect, or rather, lack of effect, upon the defendant's land insofar as the canal is concerned.

It does not seem open to question that the effect of sustaining defendant's contention would be to allow him, at least in a measure, to impose controls beyond the confines of his lands over waters to which others had established a legal right to use; and it would place the burden upon owners of such water rights of maintaining the water in the river to give support to the water level for his benefit.

In approaching an adjudication of the dispute between these parties, it is helpful to bring into sharp focus the contrast between the nature of the right asserted by the plaintiff, and that contended for by the defendant. It is not questioned that the water of the Weber River which the plaintiff seeks to use, was public water, subject to appropriation, and that the plaintiff's right thereto has been established under procedures recognized by law. As to the defendant, it is quite the contrary, no such claim can be made. Neither he nor his predecessors have ever done any overt act to dam, divert, or in any manner bring under control either the waters of the Weber River or the underground water in his land; nor have they done anything to acquire ownership, or to appropriate such waters by filing an application with the state engineer as has been required by statute since 1903.14 He thus has no legally recognizable basis for "water rights" in them in the sense we have always used that term.

In addition to the other difficulties encountered in permitting defendant to insist upon benefits to his property because it lies on the banks of the stream, there is the additional consideration that it would allow him to accomplish by indirection what he cannot do directly: that is, to assert and maintain rights to control of the water in

13. Ibid, 203 P.2d at page 928

14. S.L.U.1903, Ch. 100, Secs. 34, 35.

question, including to some degree the water in the Weber River, without ever having met the recognized legal requirements prerequisite to the establishment of such rights.

Under the circumstances described, to endow defendant or others similarly situated downstream owners, who in some instances might be great in number, with the right to demand damages because use of the river by owners of upstream water rights may effect the moisture in their soil, would not only impair the right of prior appropriators to use waters rightfully theirs, but may well in some instances present such obstacles as to make it practically impossible to impound and use such waters. This clearly runs counter to the basic policy of our water and irrigation law of facilitating and encouraging the conservation, development and continuous application of water resources to useful purposes.

Supporting in principle the conclusion we reach herein, and quite impossible to reconcile with the defendant's position, is the consistent policy of the law followed by this court of requiring that there be some action taken to appropriate and control waters in order to establish rights to its use. We have never gone so far as to base water rights on the mere acceptance of benefits incidental to the presence of water on or adjacent to one's land. The case of Adams

v. Portage [15] is pointed to as an exception because there was no actual diversion of the water. At least there was the affirmative act of the landowner in watering his sheep in the stream which had been done for over 40 years, upon which his right was based.

Closely analogous to the problem in the instant case is that presented in Hardy v. Beaver County Irr. Co.,[16] wherein certain claimants asserted rights in water based on natural percolation through the soil and natural overflow from a river channel. Therein the court clearly indicated that passive acceptance of benefits of such waters by those who had not by any affirmative act appropriated and put the waters to beneficial use, nor complied with statutory requirements to perfect such rights, did not permit them to maintain rights against one who had made an appropriation by diversion.

Recognition in the defendant of a right to insist upon continuous flow of water in question to benefit his property, or be compensated in damages for its diminution, could only arise from the circumstance that it lies adjacent to the stream, which would be a reversion to the long since rejected doctrine of riparian rights. In view of the decisional and statutory law of this state, any change toward recognition of

15. See Adams v. Portage Irr., Reservoir & Power Co., 95 Utah 1, 72 P.2d 648; Gunnison Irr. Co. v. Gunnison Highland Canal Co., 52 Utah 347, 174 P. 852
16. 65 Utah 28, 234 P. 524.

rights of this character should be left to a consideration of the legislature [17] rather than to insinuate any such new departure therein by judicial determination.

The conclusion herein reached obviates the necessity of considering other points raised by the parties. It is our conclusion that the order of the trial court denying defendant the right to damages should be affirmed. Costs to respondent.

WORTHEN, Justice.

I concur, except that I feel that the excerpts from Riordan v. Westwood quoted in the majority opinion are not essential to the decision in this action, and I reserve judgment on the matters expressed therein.

HENRIOD, Justice (concurring).

I am convinced I was wrong in our previous decision. I believe the trial court should be affirmed for the very simple reason that to condemn a strip for a canal is no different than to condemn it for a railroad. Neither would affect water,— underground, in a river or at a remote dam. Any discussion of water or water rights, therefore, seems foreign to this case. Hence, sufficient to the day thereof should be urged the question of damages for water loss through act or installation other than that arising out of the con-demned canal. I agree generally with most of the observations of the main opinion here and of the dissenting opinion of Mr. Justice WORTHEN in our other decision.

McDONOUGH, Chief Justice, and WADE, Justice (dissenting).

We dissent and would adhere to the views expressed in the previous opinion of the court.

---

17. e. g. In Colorado meadow lands are now protected by statute. See Sec. 19, Chap. 90, Colo.Stats.1935.