*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 7**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

UTAH STREAM ACCESS COALITION,
*Appellee and Cross-Appellant,*

*v.*

VR ACQUISITIONS, LLC, and STATE OF UTAH,
*Appellants and Cross-Appellees.*

No. 20151048
Filed February 20, 2019

On Direct Appeal

Fourth District, Wasatch County
The Honorable Derek P. Pullan
No. 100500558

Attorneys:

Craig C. Coburn, Zachary E. Peterson, John L. Young, W. Cullen Battle, Salt Lake City, for appellee and cross-appellant

Eric P. Lee, Nathan D. Thomas, Elizabeth M. Butler, Salt Lake City, for VR Acquisitions, LLC

Sean D. Reyes, Att'y Gen., Tyler R. Green, Solic. Gen., Thom D. Roberts, Asst. Att'y Gen., Stanford E. Purser, Deputy Solic. Gen., Salt Lake City, for State of Utah

Michael D. Zimmerman, John J. Hurst, Salt Lake City, for amicus curiae

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which JUSTICE PETERSEN and JUDGE CHRISTIANSEN FORSTER joined.

JUSTICE HIMONAS filed an opinion concurring in part and dissenting in part, in which CHIEF JUSTICE DURRANT joined.

Having recused himself, JUSTICE PEARCE does not participate herein; COURT OF APPEALS JUDGE MICHELE M. CHRISTIANSEN FORSTER sat.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1    In *Conatser v. Johnson* we recognized a public easement right "to touch privately owned beds of state waters in ways incidental to all recreational rights" to those waters. 2008 UT 48, ¶ 19, 194 P.3d 897. Citing common-law easement principles, we held that the "incidental right of touching the water's bed is reasonably necessary" to the public's right not just to float on the water but also to wade in waters for hunting, fishing, swimming, and other forms of recreation. *Id.* ¶¶ 22–25. And we concluded that an easement right of incidental touching "does not cause unnecessary injury to the landowner." *Id.* ¶ 22.

¶2    The legislature responded by enacting the Public Waters Access Act (PWAA), Utah Code sections 73-29-101 to 73-29-208. That statute affirms the right of the public to "float on public water," *id.* § 73-29-202(1), and to "incidentally touch private property as required for safe passage and continued movement" and "portage around a dangerous obstruction in the water," *id.* § 73-29-202(2). But it also restricts the scope of the *Conatser* easement—by limiting the easement to incidental touching and portage, without any recognition of a right to wade in the stream for hunting, fishing, swimming and other recreational uses. *See id.*

¶3    This lawsuit ensued. The case was filed by the Utah Stream Access Coalition (USAC), an organization committed to maintaining public access to rivers and streams throughout Utah. In a complaint filed in the Fourth District Court USAC asserted a constitutional right of its members to wade in waters of the Provo River flowing through land owned by VR Acquisitions. And it alleged that the PWAA had unconstitutionally restricted the easement recognized by this court in *Conatser*. The district court agreed. It struck down the PWAA under "public trust" principles set forth in article XX, section 1 of the Utah Constitution—a provision that (1) deems "[a]ll lands of the State" that have been "acquired" by it as "public lands" and (2) requires that those lands "be held in trust for the people, to be disposed of as may be provided by law, for the respective purposes for which they have been or may be . . . acquired." UTAH CONST. art. XX, § 1.

¶4    We reverse and remand on the basis of a threshold error in the district court's decision. The threshold error goes to the nature of the easement as recognized in the *Conatser* case. The district court treated that easement as a right rooted in constitutional soil. It

accordingly deemed that right to be one "acquired" and "accepted" by the State under the terms of article XX, section 1. We reverse on the basis of an error in the district court's disposition of this issue. We clarify that our analysis in *Conatser* was based only on common-law easement principles. And because this court's common-law decisions are subject to adaptation or reversal by the legislature, we hold that it was error for the district court to have treated the *Conatser* easement as a matter beyond the legislature's power to revise or revisit.

¶5   The district court struck down the PWAA on constitutional grounds. In so doing it resolved some important questions of constitutional law. It treated the *Conatser* easement as a "land[] of the State" covered by article XX, concluded that such land had been "disposed of" by the State, and held that the PWAA's regulation of such land ran afoul of the "public trust" doctrine established in this provision. We stop short of resolving the core elements of USAC's constitutional challenge to the PWAA because we reverse instead on the basis of the above-noted threshold error. In reversing on this basis we do not foreclose the possible viability of the district court's ultimate disposition of this case. We explain that it may be possible for USAC to demonstrate on remand that there is a basis in historical fact—in the understanding of public easements in the late 19th century—for the easement we recognized in *Conatser*. And we leave it open to USAC to seek to make such a showing on remand.

¶6   These are significant constitutional questions. And each of them has been addressed by the parties on this appeal. But they could also be mooted on remand if USAC fails to establish that the *Conatser* easement has a historical basis as a public easement as of the time of the framing of the Utah Constitution. With this in mind, we consider some of the parties' arguments on these issues but decline to resolve them conclusively on this appeal.

I. BACKGROUND

A. *Conatser v. Johnson*

¶7   Our decision in *Conatser v. Johnson* arose out of a property rights dispute culminating in a criminal trespass action. 2008 UT 48, 194 P.3d 897. The Johnsons owned private property over which the Weber River flowed. *Id.* ¶ 3. The Conatsers "put a rubber raft in the Weber River at a public access point" above the Johnson property and touched the riverbed as their raft floated over that property. *Id.* "As they had done on at least two previous occasions, the Johnsons ordered the Conatsers off the river and told them to pick up their raft

3

and carry it out via a parallel railroad easement." *Id.* "The Conatsers refused and continued floating down the river." *Id.* "When they exited at a public access point, the Morgan County Deputy Sheriff cited them for criminal trespass." *Id.*

¶8    In a civil suit before the Second District Court the Conatsers argued that they were entitled to "'recreate in natural public waters,'" including by "'touch[ing] or walk[ing] upon the bottoms of said waters in non-obtrusive ways.'" *Id.* ¶ 4. The district court recognized a more limited public easement. It held that the Conatsers were limited to "activities that could be performed 'upon the water,'—chiefly floating—and that the right to touch the river's bed was incidental only to the right of floatation." *Id.* ¶ 5. In so doing the district court relied on a decision from the Wyoming Supreme Court in *Day v. Armstrong*, 362 P.2d 137 (Wyo. 1961).

¶9    The *Day* decision "limited the scope of the public's easement to the 'right of floatation' upon the water and allowed only those activities that could be done 'while so lawfully floating.'" *Conaster*, 2008 UT 48, ¶ 12. Citing *Day*, "the district court held that the Conatsers 'may walk along the banks of the river . . . in order *to continue floating* . . . so long as [their] actions are as minimally intrusive as possible of the private owners' land.'" *Id.* ¶ 5 (alterations in original). Yet it also held that "'[w]ading or walking along the river, where such conduct *is not incidental to the right of floatation* upon natural waters, would constitute a trespass of private property rights.'" *Id.* (alteration in original).

¶10 We reversed. We first clarified that although "the public owns state waters, the beds that lie beneath those waters may be" either publicly or privately owned: "If a body of water is navigable—that is, if it is useful for commerce and has 'practical usefulness to the public as a public highway'—then the state owns the water's bed. If it is non-navigable, [however], then its bed may be privately owned." *Id.* ¶ 9 (citations omitted). Next we noted that "[t]he public's easement to use the water" nonetheless "exists '[i]rrespective of the ownership of the bed and navigability of the water.'" *Id.* (second alteration in original). And we held that "the scope of an easement is a question of law," *id.* ¶ 10, which we resolved by reference to standards set forth in common-law decisions in Utah and others states.

¶11 We acknowledged but rejected the narrow public easement in private streambeds as recognized by the Wyoming Supreme Court in *Day v. Armstrong*. *Id.* ¶¶ 12–15. We explained that the

question of the scope of the public easement in private streambeds was a matter of first impression in Utah and was not before us in *J.J.N.P. Co. v. State*, 655 P.2d 1133 (Utah 1982). *See Conatser*, 2008 UT 48, ¶ 19 (citing *J.J.N.P.*, 655 P.2d at 1138 n.6). And we proceeded to establish a broader public easement than the Wyoming Supreme Court recognized in *Day*, encompassing a right to touch streambeds for "all recreational activities that utilize the water," including hunting. *Id.* ¶¶ 2, 14–15.

¶12  In so doing we invoked a common-law easement framework established in *Big Cottonwood Tanner Ditch Co. v. Moyle*, 174 P.2d 148, 160 (Utah 1946), and 25 AM. JUR. 2D *Easements and Licenses in Real Property* §§ 1, 81 (2007). *Id.* ¶¶ 20–21. Thus, we held that "'[a]n easement is a privilege which one person has a right to enjoy over the land of another.'" *Id.* ¶ 20 (citation omitted). And we indicated that "[t]he easement holder . . . enjoys 'the privilege to do such acts as are necessary to make effective his or her enjoyment of the easement,'" meaning that the "easement holder has the right to make incidental uses beyond the express easement and does not exceed the easement's scope if those uses are 'made in a reasonable manner and they do not cause unnecessary injury to the servient owners.'" *Id.* ¶ 21 (citations omitted).

¶13 Our determination of the proper scope of the public easement in *Conatser* was based on our attempt to balance the competing interests of the owners of the dominant and servient estates. We struck that balance by holding (1) that "touching the water's bed is reasonably necessary and convenient for the effective enjoyment of the public's easement"—its right to "float, hunt, fish, and participate in all lawful activities that utilize state waters," *id.* ¶ 23; and (2) that such touching does not "cause[] unnecessary injury" to owners of private streambeds, *id.* ¶ 26.

## B.  The PWAA

¶14 The legislature was spurred to action in response to the *Conatser* decision. The legislature viewed *Conatser* as effecting a "real and substantial invasion of private property rights." UTAH CODE § 73-29-103(5). Through the terms of the PWAA, the legislature sought to restore "the accommodation existing between recreational users and private property owners" as it existed "before the decision in *Conatser v. Johnson*." *Id.* § 73-29-103(6).

¶15 The PWAA recognizes a public right to "float on public water" that is wide enough and deep enough to float on. *Id.* § 73-29-202(1). It also preserves the right to "incidentally touch

private property as required for safe passage and continued movement" and to "portage around a dangerous obstruction in the water." *Id.* § 73-29-202(2). But the PWWA restricts the public easement to these terms. In so doing it limits the scope of the *Conatser* easement by foreclosing the right to touch a streambed for purposes other than flotation—such as for hunting, wading, and swimming. And it recognizes a right of a landowner to seek an injunction against a person who uses a streambed in a manner exceeding the scope of the statutory easement. *See id.* § 73-29-205.

### C. USAC's Lawsuit

¶16 VR Acquisitions is a private property owner who has sought to invoke this statutory remedy. VR owns property along a four-mile stretch of the Provo River. It operates Victory Ranch, which limits fishing in its streams to invited guests. Citing the PWAA, VR asserted a right to exclude the public from wading in water of the Provo River that flows through its land. This included members of USAC who sought to fish in the Provo River by wading in the streambed on VR's land.

¶17 At least one USAC member was expelled from VR's land as a trespasser—with the help of local law enforcement, who not only ordered him off the land but also cited him for criminal trespass. VR then posted "no trespassing" signs, asserting its reliance on the terms of the PWAA.

¶18 USAC challenged these actions by filing this lawsuit. USAC's complaint, filed in 2011, challenged the constitutionality of the PWAA on three grounds: (1) that it infringed USAC members' "rights to the use of any of the waters in this State for any useful or beneficial purpose" guaranteed in article XVII, section 1 of the Utah Constitution; (2) that it ran afoul of the "public trust" doctrine as established in article XX, section 1 of the Utah Constitution; and (3) that it alternatively violated the public trust principles set forth in federal common law, such as those established in *Illinois Central Railroad Co. v. State of Illinois*, 146 U.S. 387 (1892).

### D. The District Court's Decision

¶19 The district court granted partial summary judgment against USAC. It held that the PWAA did not violate article XVII or the public trust doctrine in federal common law. As to article XVII, the court concluded that the public easement recognized in *Conatser* amounted to a "right[] to the use of . . . the waters in this State for any useful and beneficial purpose," protected by the Utah Constitution. But it held that the legislature retains broad discretion

to regulate water rights under article XVII, and thus that the PWAA withstands scrutiny under this provision. As to the federal common law public trust doctrine the court held that that doctrine applies only to navigable waters—and thus does not extend to the stretch of the Provo River in question (which is not alleged to be navigable).[1]

¶20 The district court denied summary judgment on the article XX claim, however. It held that the protections of article XX, section 1 extend to the public easement right in question but concluded that disputed questions of fact precluded summary judgment and required a trial on the merits.

¶21 In holding that the public easement right asserted by USAC was an interest covered by article XX, section 1, the district court made a series of determinations of relevance to the constitutionality of the PWAA. It held that the easement right claimed by USAC was an "interest in land" protected by article XX, section 1. It also implicitly held that this interest had been "acquired" by the State under the terms of article XX. And it concluded that the acquired interest in land had been "disposed of" in a manner triggering the protections of the public trust doctrine enshrined in the Utah Constitution.

¶22 The court reserved for trial the question whether the PWAA's disposition of the public easement ran afoul of the public trust doctrine protected by article XX, section 1. At trial, the court applied a standard that it viewed as dictated by the *Illinois Central* decision—a standard allowing the State to dispose of public trust property so long as the disposition doesn't "substantially impair the public interest in the lands and waters remaining." *See Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 452 (1892). Thus, the principal focus of the court at the bench trial was the question whether the PWAA "substantially impair[ed] the public interest in the lands and waters remaining," which the court defined as all fishable rivers and streams in Utah.

¶23 After hearing all the evidence the district court concluded that the PWAA ran afoul of article XX, section 1 because it

---

[1] The district court's summary judgment decisions under article XVII and federal common law have not been challenged by USAC. They accordingly stand unchallenged and are not before us on this appeal.

substantially impaired the right of Utah fishers to recreate in public waters. Specifically the court found that the PWWA "closed more than 2,700 miles of [fishable] rivers and streams to any public recreational use other than floating." And because that "represents closure of 43%" of fishable rivers and streams "to almost all public recreational use," the court held that the PWAA exceeded the bounds of the legislature's authority under article XX, section 1.

### E. This Appeal

¶24  VR Acquisitions and the State appealed the district court's determination that the PWAA violated article XX, section 1. USAC cross-appealed on one issue—asserting that the district court had erred in defining the "lands and waters remaining" as all waters in the state rather than excluding waters traversing federal land.

¶25  In their briefing on appeal the parties put before us a series of questions implicated by the terms of article XX, section 1. Those questions include (1) whether the easement recognized in *Conatser* is a "land[] of the State"; (2) whether such land has been "acquired" in a manner triggering the public trust doctrine; (3) whether the State "disposed of" the land as that term is used in the Utah Constitution; (4) the applicable standard of scrutiny for assessing the constitutionality of the PWAA under article XX, section 1; and (5) whether the PWAA survives scrutiny under that standard. We received initial and supplemental briefing on these important questions.

¶26 We also sought supplemental briefing on a threshold question of justiciability. In a supplemental briefing order issued after oral argument we asked the parties to address the question whether "a determination of the navigability of the stretch of the Provo River in question [is] a necessary antecedent to a determination of the constitutionality of the Public Waters Access Act, rendering any opinion made before determining the navigability an advisory opinion based on a hypothetical state of facts."

¶27  The above questions are now presented for our review. Each of the questions presented is a question of law. Our review is accordingly *de novo. See B.A.M. Dev., LLC v. Salt Lake Cty.*, 2012 UT 26, ¶ 8, 282 P.3d 41.

### II. ANALYSIS

¶28 The questions presented on appeal are extensive and substantial. We must first address the question of justiciability—of

whether the lack of any determination of the navigability of the relevant stretch of the Provo River is a barrier to our deciding the merits of USAC's constitutional claims (which assume a lack of navigability). In the paragraphs below we conclude that the case as presented to us on appeal is justiciable. We hold that USAC, as plaintiff and master of its complaint, was entitled to choose to avoid the navigability question and instead to litigate the case on alternative grounds. And we conclude that the lack of any litigation or decision on the navigability question does not render our decision on the questions presented advisory in nature or foreclosed under the doctrine of constitutional avoidance.

¶29 That leads us to the merits of the case. Here we consider a range of the issues raised by the parties in their briefing—as to the nature of "lands of the State" protected by article XX, section 1, what it means for the State to "dispose[]" of such lands, and the applicable standard of scrutiny for assessing the constitutionality of the PWAA under article XX, section 1. But we do not ultimately resolve this appeal on any of these grounds. Instead we reverse and remand on what we see as an important threshold error in the district court's analysis—its (implicit) conclusion that the scope of the easement recognized in *Conatser v. Johnson* 2008 UT 48, 194 P.3d 897 was an interest in land that was "acquired" and "accepted" by the State at the time of the ratification of the Utah Constitution in 1896. This is a crucial threshold question that could moot the other issues presented in the case. And we reverse and remand to allow the district court to resolve it as an antecedent to our deciding the other important questions presented for our review.

A. Threshold Issues

¶30 The public's right to touch the bed of a public waterway may be established in either of two ways. If the waterway is "navigable" then the streambed is open to use by the public on that basis. *PPL Mont., LLC v. Montana*, 565 U.S. 576, 589 (2012) (noting that states, not private parties, "hold title to the beds under navigable waters"). The PWAA acknowledges this point. It affirms that "[t]he public may use a public water for recreational activity if" it "is a navigable water." UTAH CODE § 73-29-201(1)(a)(i). We recently clarified the governing standard of navigability under this provision. In *Utah Stream Access Coalition v. Orange Street Development*, 2017 UT 82, 416 P.3d 553, we held that the navigability standard in the PWAA "invokes a legal term of art embedded in federal law." *Id.* ¶ 3. And we clarified that this standard turns on whether a given waterway is "'generally and commonly useful to some purpose of trade or

agriculture,'" *id.* ¶ 31, or in other words as a "'public highway of transportation,'" *id.* ¶ 29 (quoting UTAH CODE § 73-29-102(4)).

¶31 The PWAA also recognizes an alternative basis for public access to a streambed—in an easement right of a "dominant" estate holder. Because the public has an unquestioned right to use the waters of the state themselves (even non-navigable ones), *see Adams v. Portage Irrigation, Reservoir & Power Co.*, 72 P.2d 648, 653 (Utah 1937), that right may also encompass an easement to touch the streambeds of those waters, *see Conatser v. Johnson*, 2008 UT 48, ¶ 19, 194 P.3d 897. And that, in turn, requires an analysis of the relevant scope of the public easement to be recognized.

¶32 USAC's claims in this case are focused on this second theory. In the proceedings in the district court USAC made clear that it was not asserting a navigability claim with respect to the stretch of the Provo River at issue here. USAC's claims, instead, have been rooted in the notion of a public easement right to touch the streambed on the VR property.

¶33 That led to the justiciability questions that we raised in a supplemental briefing order—specifically, to whether USAC's decision to eschew an allegation of navigability (as one basis for establishing access to the streambed in question) would render "advisory" our analysis of the easement basis for its claims. We now answer that question in the negative. We first conclude that this case is justiciable and thus properly presented for our review. We then respond to the dissent's concern that our decision in this case should be foreclosed by the doctrine of constitutional avoidance.

1. Justiciability

¶34 The public has a right to use streambeds underlying navigable waters within its borders. USAC could thus have asserted a claim that the relevant portion of the Provo River is navigable and that VR does not own the streambed. Yet it chose not to assert such a claim. Instead it asserted claims for relief under an alternative, easement-based theory of relief. And that was USAC's prerogative as the plaintiff and master of its complaint.

¶35 We could characterize the navigability claim as antecedent to the easement-based claim. But we have never treated navigability as a necessary antecedent. We have left it to parties to make the strategic decision whether to pursue one or the other (or both) of these sorts of claims. In *J.J.N.P.* and *Conatser*, in fact, we established the opposite premise—that either claim may be advanced. *Conatser*, 2008 UT 48, ¶ 9 ("The public's easement to use the water . . . exists

'[i]rrespective of the ownership of the bed and navigability of the water.'" (second alteration in original) (quoting *J.J.N.P. Co. v. State*, 655 P.2d 1133, 1137 (Utah 1982))). And we adjudicated claims for access rights under an easement theory in both of those cases without any concern for the fact that a navigability theory might be logically antecedent. In *J.J.N.P.* we pursued that course even in the face of an actual claim of navigability. *J.J.N.P.*, 655 P.2d at 1136.

¶36 This approach is consistent with a core component of our adversary system—the notion that the plaintiff is the master of the complaint. We leave it to the parties to plead claims and defenses in the time and manner designated by our rules. And for that reason we are in no position to second-guess USAC's decision to litigate an easement-based case by requiring it to seek broader (navigability-based) relief.

¶37 USAC chose to sue only under the theory that its members have an easement right to access the Provo River—regardless of navigability. This was a strategic choice like that made by other plaintiffs in a range of cases. A plaintiff may often deem a particular course of litigation preferable to an alternative—because the alternative seems more costly, more time-consuming, less likely to succeed, etc. And we have never thought it our business to second-guess those judgments. *See Combe v. Warren's Family Drive-Inns, Inc.*, 680 P.2d 733, 736 (Utah 1984) ("A court may not grant judgment for relief" that is not "within the theory on which the case was tried"—even if the evidence implies such relief.).

¶38 The mere possibility of an alternative claim for relief in no way renders the case nonjusticiable. If it did then our courts would often be in the business of reimagining the terms and scope of the cases presented for our decision. Consider a case involving alternative grounds for challenging a government taking of private property—one involving a broad challenge to the government's power to condemn the property in the first place and the other seeking "just compensation" under the Takings Clause. Our cases have left it to the parties to decide which of these claims to pursue.[2]

---

[2] *Compare Utah Dep't of Transp. v. Carlson*, 2014 UT 24, 332 P.3d 900 (challenging the Department of Transportation's authority under Utah Code section 72-5-13 to condemn property for highway purposes), *with Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011

(continued . . .)

We could characterize the former (broader) claim as antecedent to the latter (narrower) claim. But that has never been thought to be a basis for a court to direct the parties to litigate the broad claim *first*. Instead we leave it to parties to make the strategic decision whether to pursue one or the other or both of these sorts of claims.

### 2. Constitutional Avoidance

¶39 The dissent acknowledges the justiciability of this case but still urges a course of avoidance of the merits. It views our decision as "allow[ing] the parties to force us to address compound, complicated constitutional matters by contriving to skip over an obvious non-constitutional predicate issue." *Infra* ¶ 96. And it charges that this is contrary to "long-held principle[s] of constitutional avoidance." *Infra* ¶ 96.

¶40 We disagree. The doctrine of constitutional avoidance does not require parties to advance claims that they have forfeited.[3] That doctrine respects our adversary system of justice. It leaves it to parties to decide which claims to advance and which ones to forgo.

¶41 Our law of civil procedure has long deferred to the plaintiff as the master of the complaint. An essential attribute of that role is the prerogative of identifying claims for relief to be submitted to the court for decision. We judges are neutral arbiters—not advocates. To police that distinction we keep ourselves out of the business of

---

(continued . . .)

UT 62, 275 P.3d 208 (challenging the Department of Transportation's method of assessing just compensation under the Utah Constitution).

[3] The dissent observes that USAC is aware of these claims and has asserted an intent to pursue them, or ask another party to pursue them, if it falls short on this appeal. *Infra* ¶ 98 n.8. True. But USAC has not made an alternative claim for relief under a theory of navigability in this case. And the possibility that USAC or others may try to litigate the navigability issue later does not give this court the power to force the litigation of the issue now. It is not at all clear, in all events, that USAC will be in a position to advance a navigability claim in a second round of litigation; such a claim may be barred as a matter of *res judicata*.

second-guessing the pleading decisions of the parties. If USAC, as plaintiff, has forfeited the right to assert a navigability claim then we are in no position to reinstate it.

¶42 The notion of party control over pleading is much more than a "pithy" adage. *Infra* ¶ 102. It is a key tenet of our judicial system—a tenet rooted in a core premise of our adversary system, under which parties plead and judges judge. We recently emphasized this point in the appellate setting. *See In re Adoption of B.B.*, 2017 UT 59, ¶ 108, 417 P.3d 1 (Lee, A.C.J., opinion of the Court on this issue). In the *B.B.* case we explained that the "adversary system" ensures that parties, and not the court, have the power to assert claims of error on appeal. *Id.* We therefore held that it is the appellant that "bears the burden of identifying any and all orders being challenged on appeal." *Id.* And we expressly repudiated the judicial prerogative of a right to "search the record to 'ensure'" that a case resolved below "is 'as free as possible' from any 'defects' we [may] deem 'fatal'" on appeal. *Id.* These same principles control here. The plaintiff, like the appellant, controls the claims to be litigated by the court. And the court lacks the power to second-guess the pleading decisions of the parties—to "search the record" for claims that were not pleaded by the parties but that we might prefer to resolve. *See Combe*, 680 P.2d at 736 (holding that the "court may not grant judgment for relief" that is not "within the theory on which the case was tried").

¶43 The dissent sees the unlitigated navigability theory not as a distinct "claim" but as a logical antecedent to the easement-based public trust basis for plaintiff's case. *Infra* ¶ 101 n.11. The cited relationship between the parties' claims is accurate as far as it goes— the ownership-based (navigability) theory of relief could moot the easement-based (public trust) theory of relief. But that does not undermine the conclusion that these are distinct claims—or suggest that we have authority to require the plaintiffs to assert a broad claim for relief that they have chosen not to raise.

¶44 The dissent seeks refuge for its contrary conclusion in the doctrine of constitutional avoidance. But that doctrine preserves— and does not override—the principles of adversariness that we have cited. Our cases have never endorsed a principle of avoidance that would allow us to force the parties to litigate claims that they have openly waived. And the cited cases from other jurisdictions are not controlling authority here.

¶45 The dissent's cases, moreover, do not establish a general judicial prerogative of requiring parties to litigate claims that they have waived or otherwise chosen to forgo. At most they identify one

narrow circumstance—under the requirement of administrative exhaustion—in which a court may dismiss a constitutional claim on the ground that a non-constitutional claim should have been pleaded first. *See W. E. B. DuBois Clubs of Am. v. Clark*, 389 U.S. 309 (1967). But that exception is not implicated here. And the dissent's other cases, *see Hosp. & Serv. Emps. Union Local 399, Serv. Emps. Int'l Union, ALF-CIO v. NLRB*, 743 F.2d 1417 (9th Cir. 1984); *VNA Hospice of Maryland v. Dep't of Health & Mental Hygiene*, 961 A.2d 557 (Md. 2008); *Ainsworth v. SAIF Corp.*, 124 P.3d 616 (Or. Ct. App. 2005), are distinguishable.[4] *Hospital & Service Employees Union* involves a supplemental briefing order asking the parties to address a statutory predicate that was pleaded by the plaintiff and litigated in the proceedings below. *VNA Hospice* speaks only to the judicial prerogative of a court of last resort to reframe the issues presented

---

[4] The dissent laments our focus on the procedural posture of these cases. It suggests that in so doing we miss the "substantive point" that the cases articulate—that parties cannot force courts to resolve constitutional questions. *Infra* ¶ 105 n.13. That is one general premise of our judicial system. But it is only a general rule, subject to exceptions. And it is only one of several premises of our system. Another is the notion that courts are not in a position to force the parties to litigate claims they have forfeited.

A party may sometimes be in a position to effectively require a court to decide a constitutional question. Where the plaintiff asserts only a constitutional claim, for example, the court will be left only to resolve that claim. And in that event the court may be left to enforce another fundamental tenet of our judicial system—that the plaintiff is the master of the complaint, and the court lacks authority to mandate the litigation of claims not pleaded.

The path to balancing the premises of our judicial system will necessarily depend on the procedural posture of an individual case. The devil will often be in the procedural details. And that is the case here. We cannot discern the breadth and force of a judicial statement of the principle of constitutional avoidance without examining the procedural background of the case in which such a statement is made. That is the reason for our focus here on procedure. Broad statements about constitutional avoidance must be understood in procedural context; otherwise we may mistake general rules subject to exceptions with hard-and-fast ones, or miss the need to balance one set of rules against another.

on *certiorari* to encompass non-constitutional grounds pleaded and litigated below. And *Ainsworth* stands for the uncontroversial proposition that an appellate court may consider new authority in resolving a claim that was properly pleaded and litigated.

¶46 The court in *W. E. B. Dubois* concededly declined to consider a constitutional claim presented by the parties. But the court was not establishing a general mandate that plaintiffs plead and litigate non-constitutional claims in the district court. It was enforcing a settled, narrow principle of administrative law—the rule of administrative exhaustion, which requires plaintiffs to exhaust their remedies in an administrative proceeding as a prerequisite to a constitutional challenge in court. *See W. E. B. Dubois*, 389 U.S. at 311–12 (declining to create an exception to the requirement of administrative exhaustion because "Congress has provided a way for appellants to raise their constitutional claims" and plaintiffs did not avail themselves of that resource). That settled rule has no application here. And it does not support the approach proposed by the dissent.

¶47 The administrative exhaustion principle is the exception that proves the general rule. Our courts may mandate exhaustion of administrative claims that are viewed as necessary predicates to litigation of constitutional claims. *See, e.g.*, *Patterson v. Am. Fork City*, 2003 UT 7, ¶ 17, 67 P.3d 466 (affirming a lower court decision dismissing plaintiff's claims because plaintiff failed to exhaust their administrative remedies). But otherwise we leave it to plaintiffs to decide whether to pursue litigation on constitutional or non-constitutional grounds.

¶48 The dissent's other cases are not to the contrary. *Hospital & Service Employees Union* does include the warning that "we shouldn't let litigants 'force this court to decide . . . serious constitutional claim[s] by the simple expedient of not fully asserting a predicate . . . issue.'" *Infra* ¶ 97 (quoting *Hosp. & Serv. Emps. Union*, 743 F.2d at 1425). But the "predicate" at issue in that case was not an entirely new claim that had not been pleaded or litigated below. It was a statutory basis for challenging an NLRB order requiring the union to cease and desist the distribution of certain handbills. And that statutory basis was obviously pleaded and litigated below—as it was the stated ground for the decision reviewed on appeal. *See Hosp. & Serv. Emps. Union*, 743 F.2d at 1421 ("A majority of the NLRB held that the Union's handbilling and advertisements violated [the statute] . . . ."). The union omitted that statutory predicate in its appeal to the Ninth Circuit—instead resting only on a constitutional

claim. And the Ninth Circuit's decision was just to order supplemental briefing on the omitted statutory claim. *Id.* at 1425.

¶49 We need not and do not decide whether that course would be appropriate in a case presented to this court. But we can say that the *Hospital & Service Employees Union* case presents a very different course of action than that proposed by the dissent. Here we are dealing with an entirely new claim that was neither pleaded by the parties nor litigated below. And *Hospital & Service Employees Union* provides no basis for the mandatory consideration of such a claim.

¶50 *VNA Hospice* is similarly distinguishable. In that case the court also avoided a constitutional question by resolving the case on statutory interpretation grounds. *See VNA Hospice*, 961 A.2d at 572. But the statutory interpretation claim at issue was pleaded by the plaintiff and litigated by the parties in the district court—and even on direct appeal. *See id.* Thus, in invoking the doctrine of constitutional avoidance in *VNA Hospice*, the Court of Appeals of Maryland was not requiring the parties to litigate a claim they actively waived. It was exercising its established discretion to frame the scope of its decision on *certiorari*—holding that the party's "failure to raise [a] statutory interpretation question in its certiorari petition presents no impediment to this Court's resolution of the case based upon our interpretation of the statute." *Id.* This is a settled tenet of judicial discretion of a court of last resort on *certiorari* review. *See Nichols v. Jacobsen Constr. Co.*, 2016 UT 19, ¶ 33, 374 P.3d 3 (explaining while the court is typically guided by the order granting the *certiorari* petition, it is not precluded from reaching other, subsidiary issues fairly included in the question presented). It does not establish the sweeping power to actively mandate that parties plead and litigate a non-constitutional claim from the outset in the district court.

¶51 The *Ainsworth* case also falls short. That case involved a single question for review on appeal—the validity of "an administrative rule under which a worker who has sustained compensable brain damage from an injury cannot receive benefits for psychiatric impairment caused by the same injury even when the psychiatric impairment alone" is "more extensive than the organic brain damage alone." *Ainsworth*, 124 P.3d at 617–18. On appeal from an administrative proceeding the claimant asserted that the rule was "inconsistent with" governing statutes "because those statutes require that compensation be based on the total extent of disability resulting from an injury." *Id.* at 618. And it also argued that the rule ran afoul of "the equality guarantee" in the Oregon and United

States Constitutions. *Id.* The statutory basis for challenging the administrative rule was not preserved in the administrative proceeding. *Id.* And the employer asked the Oregon Court of Appeals to ignore the claimant's statutory authority in support of its challenge. *Id.* The *Ainsworth* court declined that request. In so doing it did not endorse a principle of sweeping appellate power to mandate the relitigation of a case on claims that were waived by the parties. It applied a settled principle of Oregon law of preservation—allowing the presentation of additional authority for claims that were litigated below. *See id.* at 619 (noting that "'the parties' omission of a dispositive source or argument of ordinary law cannot compel a court to a needless constitutional decision'" (citation omitted)). That principle is consistent with our law in Utah. *See Patterson v. Patterson*, 2011 UT 68, ¶ 18, 266 P.3d 828 (new authority may be presented on appeal without running afoul of law of preservation). And it can easily be accepted without endorsing the broader power proposed by the dissent.

¶52 The line between new "claims" and new "authority" to support existing claims is not always easy to draw. But our cases have identified factors of relevance to this distinction. Those factors make some cases straightforward—and nowhere close to the line. This is one of those cases. The navigability theory of relief is clearly a distinct claim, and thus not a matter falling within the principle set forth in *Ainsworth*.

¶53 In *Patterson v. Patterson* we emphasized the need to examine the policy premises of the preservation rule in distinguishing matters that must be preserved from those that need not be. We noted that the "semantics" of *claim* and *argument* cannot alone be sufficient. *Id.* ¶ 15. We instead urged the need to take into account the policy of "judicial economy" and the principle of "fairness." *Id.* We noted that the "policy of judicial economy is most directly frustrated when an appellant asserts unpreserved claims that require factual predicates," and thus concluded that "the preservation rule should be more strictly applied when the asserted new issue or theory 'depends on controverted factual questions whose relevance thereto was not made to appear at trial.'" *Id.* (citation omitted). We also indicated, by contrast, that this policy is not offended by the consideration of "new authority relevant to issues that have properly been preserved." *Id.* ¶ 18. And we emphasized that consideration of the new authority in *Patterson* could be "resolved purely as a matter of law" without a need for new factual development in the district court. *Id.* ¶ 20.

¶54 These principles are consistent with the decision in *Ainsworth* but incompatible with the disposition proposed by the dissent. The statutory authority advanced in *Ainsworth* was a matter easily considered on appeal without the need for any factual development in the district court. The navigability claim identified by the dissent is different. We could consider it not for the purpose of assessing the correctness of the decision presented for our review on appeal, but only as an alternative basis for decision. The question of navigability, moreover, would require extensive discovery and factual development. Presumably that's one reason why the plaintiffs in this case chose to forgo this claim. And it is also a basis for our conclusion that this is not a matter we may raise on our own accord on appeal.

¶55 The constitutional avoidance canon is a principle of judicial restraint. It recognizes that constitutional decisions bind other branches of government—in a manner precluding them from stepping into their usual policymaking role. And it accordingly dictates a preference for a judicial decision that avoids that problem. *See* Henry Paul Monaghan, *On Avoiding Avoidance, Agenda Control, and Related Matters*, 112 COLUM. L. REV. 665, 676 (2012) (noting that the courts have treated this form of avoidance as a discretionary matter of internal "governance" "designed to ameliorate the 'friction between democratic principles and judicial authority'").

¶56 The dissent's proposed extension of this canon is not restrained. If we directed parties to plead and litigate claims they have forfeited we would be taking an active step beyond the bounds of the judicial power defined by well-established rules of pleading, procedure, and preclusion. We would be pulling the rug out from seven years of investment in this case. That is not restraint. And it is not dictated by the canon of constitutional avoidance.

## B. Merits Issues

¶57 That takes us to the merits. Article XX, section 1 protects "[a]ll lands of the State that have been, or may hereafter be granted to the State by Congress, and all lands acquired by gift, grant or devise, . . . or that may otherwise be acquired . . . ." UTAH CONST. art. XX, § 1. It says that such lands "are hereby accepted" and "declared to be the public lands of the State." *Id.* And it provides that they "shall be held in trust for the people, to be disposed of as may be provided by law, for the respective purposes for which they have been or may be granted, donated, devised or otherwise acquired." *Id.*

¶58 The district court found that USAC had carried its burden of establishing the unconstitutionality of the PWAA under the above provisions. It held that the public easement recognized in *Conatser* is an interest in land that is "included in Article XX, Section 1." It based that conclusion on the notion that this court's decisions in *J.J.N.P.* and *Conatser* "applied principles of real property law" in defining the public easement asserted by USAC. And it proceeded to conclude that the PWAA ran afoul of the public trust doctrine in article XX, section 1 because it "closed more than 2,700 miles of [fishable] rivers and streams to any public recreational use other than floating" and "substantially impaired the public's interest in the lands and waters remaining" in the State.

¶59 VR and the State have challenged several premises of the district court's determination that article XX is implicated here. In the initial and supplemental briefs filed with the court, VR and the State have claimed that (1) a mere public easement is not a "land[] of the State" protected by article XX, section 1; (2) the State has not "disposed" of any such lands; and (3) the district court applied the wrong standard of scrutiny in its application of the public trust doctrine, in particular in its application of a standard from *Illinois Central Railroad Co. v. State of Illinois*, 146 U.S. 387 (1892). Each of these important questions is discussed below. But we ultimately stop short of resolving the case on these grounds because we find a threshold error that could potentially make these issues moot.

¶60 We hold, in particular, that the district court erred in concluding that the easement as recognized in our decision in *Conatser* was a right that was "accepted" or "acquired" by the State at the time of the framing of the Utah Constitution. This was an implicit but necessary basis of the district court's holding. And we find that it was in error because there was no inquiry into the historical basis for the *Conatser* easement—only an assumption that the easement is somehow rooted in the constitution. We reverse that determination because our analysis in *Conatser* was not constitutionally based. It was rooted in common-law easement principles. And the legislature is empowered to recalibrate and even reverse our common-law decisions. We accordingly reverse the district court's decision and remand to give USAC an opportunity to establish a historical, 19th-century basis for the easement that it seeks to root in article XX, section 1, of the Utah Constitution.

1. "[L]ands of the State"

¶61 VR asserts that the *Conatser* easement cannot constitute a "land[] of the State" because "[w]aters are not lands." The State

makes a parallel argument. It seeks to frame the easement as a right to use water, not land. And since the *Conatser* easement arose out of the public's ownership of and right to use public waters, the State posits that the easement cannot be construed to be an interest in land.

¶62 These arguments misunderstand the nature of the easement at issue, however. The public undoubtedly has a right to recreate on public waters, a right expressly reserved in the PWAA. The effect of the *Conatser* decision, moreover, was to expand the scope of that right to touch privately-owned streambeds. So the district court was correct to consider the easement an *interest* in land because an easement to touch a streambed (land) is not an interest in water.

¶63 Yet that conclusion is not in itself sufficient. Article XX, section 1 does not protect mere "interests" in land. It protects "lands of the State." And that could make a difference in the ultimate disposition of the question whether a public easement could qualify as a "land[] of the State" protected by article XX, section 1.

¶64 An easement is surely an *interest* in land. But the mere existence of such an interest may not be sufficient to trigger the protections of article XX, section 1. The key question concerns the scope of the public understanding of "lands of the State" as of the time of the framing of the Utah Constitution.

¶65 This is an important question. Yet a conclusive answer would require more extensive originalist analysis than that presented by the parties in their briefing to date. We may eventually need to decide this question (in a subsequent appeal, for example). We stop short of doing so here, however, because we find the issue premature in light of the crucial threshold error that we discuss in more detail below. *See infra* Part II.B.4.

2. "[D]isposed of as may be provided by law"

¶66 VR and the State also maintain that the PWAA does not violate article XX, section 1 because the act does not "'dispose of' any public land." They propose to define "dispose" as "[t]o alienate or direct the ownership of property." (Citing BLACK'S LAW DICTIONARY 1st ed. 1891). And they argue that the State has not ceded control over or alienated the land but has merely managed its trust property by regulating the scope of the easement. This regulation, in the view of VR and the State, is subject to rescission by a subsequent legislature and does not implicate article XX, section 1.

¶67 The State may have a point about the verb "disposed." To "dispose of," in the context of a reference to a property right, may most naturally be understood as a reference to the PWAA of "transferring something . . . by deed or will" or "relinquishing of property." *Disposition*, BLACK'S LAW DICTIONARY (10th ed. 2014). Article XX, section 1, after all, speaks of the disposition of lands "as may be provided by law," and "for the respective purposes for which they have been . . . granted, donated, devised or otherwise acquired." UTAH CONST. art. XX, § 1. In context, then, the "disposed of" clause may just be a reference to the back end of the real estate transaction that began with the acquisition of the land by grant, donation, or devise. And the "disposed of" clause may thus be speaking only about the terms of the State's attempts to sell or otherwise devise public lands to another party.

¶68 This conclusion, however, may not foreclose USAC's claims. Even if "disposed of" just means to sell or devise, the State would still have to deal with the "public trust" clause in article XX, section 1. Article XX, section 1 does not just prescribe terms for the disposition of State lands. It also states that such lands "shall be held in trust for the people." *Id.* This is at least arguably an independent duty attaching to public lands—a requirement that the State hold such lands "in trust for the people" while such lands are still owned by the State, and before they are sold or devised.

¶69 Again, however, as with the "lands of State" question, we decline to resolve these issues conclusively in light of a threshold error in the district court's decision—an error that could moot the need for a final resolution of this and other questions presented in this case.

3. The Standard of Scrutiny

¶70 VR and the State complain that the district court should have given more deference to the legislature's judgment on how best to manage public lands and how to define the appropriate scope of the prevailing public easement. They claim that "all nonnavigable waters" are "publici juris, subject to the plenary control of the designated states." *Cal. Or. Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 163–64 (1935). And they maintain that the district court erred in second-guessing the legislature's determination of the appropriate scope of the public easement in the PWAA.

¶71 In striking down the PWAA the district court relied on the standard set forth by the Supreme Court in *Illinois Central Railroad Co. v. State of Illinois*, concluding that the State could dispose of

public land as long as the disposition did not "substantially impair the public interest in the lands and waters remaining." 146 U.S. at 452. In so doing the district court defined the "waters remaining" as all fishable rivers and streams in Utah. VR and the State challenge this approach. They maintain that the "waters remaining" should include "flat water, such as lakes and reservoirs" as well as non-fishable waters that could be used for other recreational purposes.

¶72 This implicates some important questions of state constitutional law. If the claimed easement is a "land[] of the State" that has been "disposed" of or otherwise triggers a public trust obligation, we would then have to identify the scope of the State's public trust duties—or in other words the standard of scrutiny for the judicial assessment of the PWAA's regulation of the public easement.

¶73 It may be fair to conclude that the "trust" reference in article XX, section 1 would have been understood at the time of the framing of the Utah Constitution as invoking a term of art from existing case law, including (perhaps most prominently) the Supreme Court's decision in *Illinois Central*.[5] But it is not at all clear that the district court's balancing approach is compatible with the standard set forth in *Illinois Central*. We are skeptical of the idea that the public trust doctrine in article XX, section 1 allows the State to justify its restriction of the use of public lands on the ground that it has not "substantially impair[ed] the public interest in [other] lands and waters"—those that are deemed "remaining." *See id.* We think *Illinois Central* may properly be read more narrowly.

¶74 In *Illinois Central* the Illinois Legislature had granted title to a railroad company to a piece of submerged land consisting of a

---

[5] The *Illinois Central* decision, however, is not binding authority. That decision applied a standard of federal common law. And the question presented here concerns the meaning of a provision of the Utah Constitution—a question on which we alone have the final say.

In so stating we do not mean to denigrate the significance of *Illinois Central*. As a decision handed down just three years before the ratification of the Utah Constitution, we think that *Illinois Central* may help inform the search for the historical understanding of the public trust principles embedded in the Utah Constitution. And it is with that in mind that we outline some of our thinking on the significance of this case in the paragraphs below.

portion of the Chicago harbor. *Id.* at 433–44. That grant was challenged under the public trust doctrine. And the Supreme Court struck down the disposition on the ground that the submerged land was held in trust for the people and thus was "different in character from that which the state holds in lands intended for sale." *Id.* at 452. In so doing the court set forth a standard for assessing the propriety of a disposition of public land under the common law public trust doctrine. And it made reference to certain dispositions of property that may constitute a "valid exercise of legislative power consistent[] with the trust to the public." *Id.* Those permissible dispositions included "grants of parcels of lands under navigable waters that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining." *Id.*

¶75 The district court in our case interpreted this language as establishing a balancing test that would allow the courts to uphold the regulation or restriction of the use of certain public lands so long as other, "remaining" lands are not "substantially impair[ed]." But the *Illinois Central* opinion may not lend itself to that reading. In context, *Illinois Central* may simply be acknowledging the fact that some dispositions of public waters or lands may enhance the public's use and enjoyment of that property. The court, in relevant part, seems to be clarifying that the disposition of land for "the erection of wharves, docks, and piers" could help the public "enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein." *Id.* These dispositions, in other words, are seen as enhancing the public use of navigable waterways (the Chicago River and Lake Michigan). And the court seems to be concluding that the disposition of the property in question is permissible to the extent it does not "substantially impair the public interest in the lands and waters remaining." *Id.*

¶76 In context, this does not seem to be an endorsement of the idea that Illinois could block public access to the Chicago River or Lake Michigan so long as it preserved access to a substantial number of *other waterways*. Indeed, the *Illinois Central* court at least arguably suggests the opposite. It does so in contrasting a disposition of property for "the erection of wharves, docks, and piers" with "the abdication of the general control of the state over lands under the navigable waters of *an entire harbor or bay, or of a sea or lake*." *Id.* at 452–53 (emphasis added). The latter sort of disposition seemingly is viewed as a gross infringement of the public trust doctrine. And that kind of disposition—of restriction of public access to an entire

waterway—seems to be presented as a classic infringement of the public trust.

¶77 This suggests that the district court's balancing in this case may not have been in line with the standard set forth in *Illinois Central*. And to the extent the *Illinois Central* test is in line with the public understanding of the public trust principles embraced in article XX, section 1, the district court may have erred in the standard of scrutiny that it applied.

¶78 We decline to announce a square holding on this issue, however, because we identify a clear basis for reversal in the district court's threshold error. But we do note our skepticism of the district court's reading of *Illinois Central* and of the standard of scrutiny that it attributed to that decision.

4. "[A]cquired" and "accepted" by the State

¶79 VR and the State contend that article XX, section 1 does not apply because the State has never "acquired" or "accepted" the *Conatser* easement. The parties go so far as to argue that the State cannot acquire the easement because the public, not the State, has ownership of public waters. And if the State cannot take ownership of the water, they argue, it cannot acquire a corollary easement to touch the streambeds.

¶80 USAC, on the other hand, notes that article XX, section 1 states that land that was "otherwise acquired" is subject to public trust principles. And USAC argues that "otherwise acquired" is a broad concept that encompasses all methods of acquisition. It notes that the State could have acquired the easement in the same way that the State acquired title to beds of navigable waters—"implicitly 'by operation of law as an incident to the sovereignty of the state.'" (quoting *State v. Rolio*, 262 P. 987, 990 (Utah 1927)).

¶81 Again the parties have identified some important questions. But we need not and accordingly do not resolve all of them. We reverse and remand on the basis of one threshold error.

¶82 USAC is right to note that article XX, section 1 does not limit itself to acquisition by "gift, grant or devise." UTAH CONST. art. XX, § 1. The listed means of acquisition seem to be exemplary. Any acquisition seems to count—so long as the land is "otherwise acquired." *Id.* But that does not necessarily mean that "acquired" is without content or limitation. Even broad catch-all terms are limited by context. *See* ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199 (2012) (noting that the

*ejusdem generis* canon suggests that a general catch-all term at the end of a list should be interpreted in light of the characteristics of the specific terms in the list).

¶83 And the listed means of acquisition ("gift, grant or devise") seem to involve some participation of the State. And that could suggest that the State would likewise have to participate in a similar manner in accepting a public easement right to use the waters of the State. Otherwise the State could be saddled with managing even very dangerous, expensive property (like a hazardous waste dump) without any agreement on its part.

¶84 All of this suggests a possible basis for concluding that not all methods of acquisition would qualify under the terms of article XX, section 1. But again we do not render a conclusive decision on this question. We stop short of resolving it because we see a different defect in the district court's decision—an alternative basis for our determination that there is no basis on the current record for the district court's decision that the State "acquired" and "accepted" the public easement asserted by USAC.

¶85 The threshold error that we identify is the district court's determination that the public easement recognized in *Conatser* is an interest in land that is "included in Article XX, Section 1." That decision was rooted only in the observation that in *J.J.N.P.* and *Conatser* we "applied principles of real property law." That may be true. But there is a key unanswered question lurking in the background here. It concerns the nature and scope of that easement interest at issue—and whether it can be viewed as having been "acquired" and "accepted" by the State under the terms of article XX, section 1.

¶86 That determination cannot be made by mere reference to our analysis in *J.J.N.P.* and *Conatser*. In those cases we were not asked to analyze the historical scope of a public easement in use of public waters at the time of the framing of the Utah Constitution. And we did not make any such determination. We simply applied common-law trust principles in concluding (1) that the "touching" of a streambed "is reasonably necessary and convenient for the effective enjoyment of the public's" right to "float, hunt, fish, and participate in all lawful activities that utilize state waters," *Conatser v. Johnson*, 2008 UT 48, ¶ 23 194 P.3d 897; and (2) that such touching does not "cause unnecessary injury" to owners of private streambeds, *id.* ¶ 22.

¶87 These conclusions were rooted in common-law trust principles that we imported from modern case law and a chapter

from *American Jurisprudence*.[6] *Id.* ¶¶ 20–21. And if the scope of the easement established in *Conatser* is rooted only in common-law trust principles then the legislature is free to override our analysis. The legislature retains broad legislative power. UTAH CONST. art. VI, § 1 (vesting "[t]he Legislative power of the State" in the house and senate). And that power encompasses the right to second-guess or override the standards set forth in our common-law decisions. *See Anderson v. Bell*, 2010 UT 47, ¶ 16 n.5, 234 P.3d 1147 ("It is a fundamental principle that . . . the legislature has the authority to abrogate the common law . . . .").

¶88  This highlights the threshold error that we see in the district court's decision. The mere fact that *Conatser* represents this court's assessment of the proper scope of a common law public easement does not mean that that easement was "acquired" and "accepted" by the State. To rise to that level the easement would, at a minimum, have to be shown to be in line with the sort of public access right that our law would have dictated at the time of the framing of the Utah Constitution—and thus "acquired" and "accepted" by the State under the terms of article XX, section 1.

¶89  The governing provision of the Utah Constitution says that lands acquired by the State by any of a range of means—"by gift, grant[,] devise" or "otherwise"—are "hereby accepted." UTAH CONST. art. XX, § 1. So a public easement dictated by our law in the late 19th century is at least arguably a "land" that was "accepted" by

---

[6] The same goes for the decisions we relied on in *Conatser*— *J.J.N.P.* and *Adams*. *J.J.N.P. Co. v. State*, 655 P.2d 1133, 1136 (Utah 1982) (holding the public had recreational rights in the waters of a lake even though it was surrounded by landowner's property; applying common-law easement principles in concluding that "there is a public easement over the water regardless of who owns the water beds beneath the water"); *Adams v. Portage Irrigation, Reservoir & Power Co.*, 72 P.2d 648, 652 (Utah 1937) (holding that waters in Utah are of two classes, private and public, and applying common-law principles in concluding that title to public waters "is in the public; all are equal owners").

the State through ratification of article XX, section 1 of the Utah Constitution.[7]

¶90 That question was not resolved by the district court and it is not adequately presented for our disposition on appeal. We therefore reverse and remand to allow the parties to present further argument and analysis of this question to the district court in the first instance. We do so because we view this as a threshold question of significance in this important case—and because the disposition of this issue could moot the remaining questions presented to us on this appeal.

¶91 If the district court determines that the *Conatser* easement exceeds the scope of the public easement that would have been accepted under the law of the late 19th century, then that may be the end of this litigation. USAC, as noted, has placed all of its eggs in the easement basket in this litigation. It has rooted its article XX, section

---

[7] In so stating we do not foreclose the possibility that an easement may not ultimately qualify as a "land[] of the State." As noted above, *supra* II.B.1, we leave for another day the question whether an easement, as an undoubted *interest in land*, would have been deemed a "land[] of the State." Our point here is just that there is a preliminary question whether the easement claimed by USAC (that set forth in *Conatser*) would have even been accepted by our law at the time of the framing of article XX.

HIMONAS, J., concurring in part and dissenting in part

claim to access to the Provo River in the notion that the *Conatser* easement is a public land that was acquired and accepted by the State, and subject to the public trust doctrine. If that premise fails because the scope of the *Conatser* easement is shown to be a product of common-law developments in the 20th and 21st centuries, then USAC would be in no position to assert that the State "acquired" or "accepted" any such easement at the time of the ratification of the Utah Constitution. And in that event USAC's claim may be subject to dismissal.

¶92 If USAC can establish the historical premise of its claimed easement, however, then the district court may be placed in a position of resolving a range of the other issues highlighted above. It is with this eventuality in mind that we offer some guidance on the above issues. And we invite the district court to revisit some of the other premises of its initial decision in this case, which we hereby reverse and vacate, in light of the guidance we provide herein.

### III. CONCLUSION

¶93 We recognize and respect the extensive time and effort that the district court and the parties have invested in the disposition of this important case. But we find that the district court's decision suffers from a threshold error that we cannot resolve and that could render unnecessary any conclusive disposition of any of the other issues presented in this case. For that reason we reach only the threshold issue highlighted above. And we remand to allow the district court to manage the further litigation of this and other issues as they may arise.

¶94 In so doing we leave it to the able discretion of the district court to decide on the precise procedure for further proceedings on remand. It is unclear from our vantage point, for example, whether the case should be reopened for further discovery or whether the parties should be asked to simply present argument on the basis of material that is already in the record. The district court should decide that question in the first instance on remand. It should also decide on the procedure and ordering for decision on any of the other issues presented in this case—whether by further motion or a second bench trial.

––––––––––

JUSTICE HIMONAS, concurring in part and dissenting in part:

¶95 The doctrine of constitutional avoidance has existed since our nation's infancy. To quote Chief Justice John Marshall:

> No questions can be brought before a judicial
> tribunal of greater delicacy than those which involve

> the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them; but if the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.

*Ex parte Randolph*, 20 F. Cas. 242, 254 (C.C.D. Va. 1833) (Marshall, J., concurring). Because I believe the majority opinion forsakes this norm, I respectfully dissent, albeit only in part.

¶96  I'm fully on board with the majority's account of *Conatser v. Johnson*, 2008 UT 48, 194 P.3d 897. We always have the prerogative to clarify a prior opinion. But that's as far down the line as I'm willing to go. I part company with my colleagues at their decision to allow the parties to force us to address compound, complicated constitutional matters by contriving to skip over an obvious non-constitutional predicate issue. This gambit by the parties is noxious to our long-held principle of constitutional avoidance.

I

¶97 As a decisional rule we shouldn't let litigants "force this court to decide . . . serious constitutional claim[s] by the simple expedient of not fully asserting a predicate . . . issue." *Hosp. & Serv. Emps. Union, Local 399*, 743 F.2d 1417, 1425 (9th Cir. 1984). This rule keeps faith with first principles and is consonant with the treatment of this topic by other courts.

¶98 Before I turn to a review of these principles and the authorities, a brief account of how the topic presents itself here is in order. By the appellees own admission, they intentionally left aside (while simultaneously attempting to preserve for future, potential litigation) an inquiry into whether the Provo River is navigable.[8]

---

[8] The majority states that the parties have actively disclaimed these potential claims. *Supra* ¶ 40. This is incorrect. USAC has expressly stated its awareness of these issues and their intent to pursue them. In USAC's words:

> In this matter, the Coalition seeks to preserve the public's *right to use* public waters and their beds irrespective of whether the waters are navigable under state and federal law and the Equal Footing Doctrine. In doing so, the Coalition does not concede that the

(continued . . .)

Instead, by choosing to frame the litigation in terms of "an easement right of a 'dominant' estate holder," *see supra* ¶ 31, both parties have asked the court to blind itself and suppose that VR Acquisitions owns the streambed of the Provo River[9] and to limit its analysis based on that supposition. The majority does just that. And with this predicate issue now neatly tucked away, the majority goes on to outline the parties' future briefings before the district court on a number of important constitutional issues.

¶99 The glaring problem with this approach is that VR Acquisitions may not own the streambed. The parties appear to accept for purposes of this litigation that the Provo River was at one time used for log drives. To this end, in paragraph 8 of the Stipulated Statement of Undisputed Material Facts section of its memorandum in support of its motion for summary judgment, USAC notes that, "[t]he Provo River was used during the 1880s and 1890s, to float timbers during high waters from the Uinta Mountains to Utah Valley and points in between, where they were used for railroad ties, railroad trestle timbers, mine shoring timbers, cordwood or saw wood."

¶100 This factual assertion provides a basis in the record from which USAC could argue that the Provo River was both useful for commerce and had practical usefulness to the public as a public highway. *See Utah Stream Access Coal. v. Orange St. Dev.*, 2017 UT 82, ¶ 19, 416 P.3d 553 (noting the PWAA's definition of "navigable water" as "a water course that is *useful for commerce* and has a useful capacity as a *public highway of transportation*") (citation omitted)

---

(continued . . .)

> Provo River is non-navigable. Indeed, the Coalition believes that the Provo is navigable. Should the Coalition not succeed in this matter, it anticipates that the Coalition or others will pursue a claim of public *ownership* of the waters and bed of the Provo River under the federal Equal Footing Doctrine.

Memorandum in Support of Utah Stream Access Coalition's Motion for Summary Judgment, vii n.1, Sept. 2, 2011.

[9] Indeed, VR Acquisitions *must own it*, under USAC's assertion of a dominant estate easement right, as the corollary servient estate holder.

(internal quotation marks omitted). And, as "the touchstone of navigability is commercial utility," this court has previously held that "log drive evidence in the record can adequately establish commercial utility." *Id.* ¶¶ 29, 31. Furthermore, a regular and common commercial use such as log driving may satisfy the navigability test "even if navigable conditions are not continuous." *Id.* ¶ 34.

¶101 I express no opinion as to whether the Provo River's history does in fact support a claim of navigability, but the potential for such a claim makes any determinations of constitutional questions premature and potentially unnecessary. Therefore, before proceeding as the majority does, I would either request supplemental briefing on this question or, preferably, instruct the district court to take it up on remand.[10] But, instead, the majority acquiesces to the parties' set-up—for purposes of this litigation the navigability of the relevant stretch of the Provo River isn't in dispute—and unnecessarily allows the parties to manufacture a case in which the court must decide important constitutional issues.[11] This is anathema to how courts should go about the business of judging.

II

¶102 To be sure, it's generally true, as the majority states, that we treat "the plaintiff as the master of the complaint." *See supra* ¶ 41. But

---

[10] The majority's assertion that our focus on the ownership question would contravene judicial economy by inserting a new claim proves too much. *Supra* ¶ 53. Judicial economy is a worthy goal but not at the cost of forfeiting our prerogative over constitutional questions. We cannot put the cart before the horse by allowing the parties to potentially and unnecessarily create a constitutional question so that we may more efficiently and speedily resolve their case. The parties' failure to raise the ownership of the streambed at trial should properly be remedied by remand to the district court.

[11] VR Acquisition's condition of owning the streambed is essential to the majority's disposition of the case. It's not just a logical antecedent but is in fact a *necessary* antecedent to a public trust based disposition. The majority's approach unavoidably accepts the parties' stipulations as to constitutional ownership.

pithy adages don't trump constitutional norms.[12] It's vital that this court "not be forced to ignore the law just because the parties have not raised or pursued obvious arguments," *Kaiserman Assocs., Inc. v. Francis Town*, 977 P.2d 462, 464 (Utah 1998), particularly when it comes to constitutional matters. "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Ashwander v. Tenn. Valley Auth.*,

---

[12] The majority unsuccessfully tries to raise this adage to the same plane as constitutional avoidance. *Supra* ¶ 45 n.4. They err in doing so. First, and tellingly, neither of the cases on which they rely — *In re Adoption of B.B.*, 2017 UT 59, 417 P.3d 1, or *Combe v. Warren's Family Drive-Inns, Inc.*, 680 P.2d 733 (Utah 1984), *supra* ¶ 42 — touch upon the constitutional avoidance issue. Second, and more importantly, the exceptions to the adage are many and extend far beyond constitutional avoidance. By way of example, (1) plaintiffs are certainly not "master of the complaint" when it comes to failing to name necessary parties, joinder, and intervention, *see* UTAH R. CIV. P. 19, 21, & 24; (2) courts don't allow parties to stipulate in their pleadings or otherwise as to the interpretation of a statute, *see, e.g.*, *GeoMetWatch Corp. v. Utah State Univ. Research Found.*, 2018 UT 50, ¶31, 428 P.3d 1064 ("[W]e are not bound by the parties' interpretation of a statute."); (3) parties cannot stipulate around mootness, *see, e.g.*, *Progressive Direct Ins. Co. v. Stuivenga*, 276 P.3d 867, 875 (Mont. 2012) ("[P]arties to litigation cannot by stipulation present a moot question to this Court as the basis of a judicial decision."); (4) parties cannot stipulate away standing or subject matter jurisdiction, *see, e.g.*, *McDonough v. Moriarty*, No. 299407, 2005 WL 843882, at *2 (Mass. Land Ct. Apr. 12, 2005) ("Standing goes to the subject matter jurisdiction of the court and cannot be conferred by stipulation . . . ."); (5) parties cannot stipulate to appellate jurisdiction, *see, e.g.*, *Hogan v. G., C. & S.F. Ry. Co.*, 411 S.W.2d 815, 816 (Tex. Civ. App. 1966) ("The appellate jurisdiction of this court cannot be created by consent[] [or] stipulation of the parties . . . ."); and (6) parties cannot stipulate to advisory opinions, *see, e.g.*, *Norman Enters. Interior Design, Inc. v. DeKalb Cty.*, 538 S.E.2d 130, 134 (Ga. Ct. App. 2000) ("The parties cannot do indirectly through the use of the joint stipulation and contingent settlement agreement what they could not do directly, i.e., obtain an advisory opinion from both the trial and appellate courts.").

297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (citation omitted) (internal quotation marks omitted).

¶103 The majority fails to properly respect this decisional norm by opting to allow the parties to skip over the predicate legal question of who holds title to the river bed. A return to first principles demonstrates just how bad an idea this is.

¶104 "The rationales behind the doctrine of avoiding constitutional questions except as a last resort are grounded in fundamental constitutional principles—the great gravity and delicacy of judicial review, separation of powers, the paramount importance of constitutional adjudication, the case or controversy requirement, and principles of federalism." *N.J. Payphone Ass'n, Inc. v. Town of W. N.Y.*, 299 F.3d 235, 249 (3d Cir. 2002) (Alito, J., concurring in the judgment) (internal quotation marks omitted). Adherence to this doctrine prevents us from issuing misguided decisions that could have otherwise been avoided through the exercise of some judicial restraint. *See Muller Optical Co. v. EEOC*, 743 F.2d 380, 386 (6th Cir. 1984) ("The duty to avoid decisions of constitutional questions . . . [is] based upon the general policy of judicial restraint."); 13 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3531.3 (3d ed. 2018) ("The concern that unnecessary decisions be avoided has its most important justification in the prospect that unnecessary decisions may be wrong decisions."). Indeed, such judicial restraint is especially important in the realm of constitutional law. *See* Thomas Healy, *The Rise in Unnecessary Constitutional Rulings*, 83 N.C. L. Rev. 848, 848–49 (2005) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, the Court has often stated, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." (alteration in original) (citation omitted) (internal quotation marks omitted)).

¶105 In solidarity with this need for judicial restraint, courts have declared that parties don't have the right to force constitutional issues on judges by skipping over non-constitutional predicate questions. *See, e.g.*, *W. E. B. DuBois Clubs of Am. v. Clark*, 389 U.S. 309, 312 (1967) (per curiam) ("[T]he District Court should not be forced to decide . . . constitutional questions in a vacuum."); *VNA Hospice of Md. v. Dep't of Health & Mental Hygiene*, 961 A.2d 557, 570 (Md. 2008) ("Litigants may not force the Court to decide constitutional issues unnecessarily by failing to raise a non-constitutional issue which can properly dispose of the case."); *Ainsworth v. SAIF Corp.*, 124 P.3d 616, 619 (2005) ("[W]hen a potential constitutional violation is involved,

the parties' omission of a dispositive source or argument of ordinary law cannot compel a court to a needless constitutional decision.") (alteration in original) (citation omitted) (internal quotation marks omitted).[13]

¶106 It certainly has been the settled practice in this state to avoid ruling on constitutional questions when they aren't needed to resolve a case. As we recently held, "[b]efore embarking on a review of . . . constitutional principles . . . our long-standing policy of avoiding unnecessary constitutional decisions . . . counsel[s] that a decision on the continuing vitality of . . . [constitutional provisions] . . . be avoided unless it is really necessary." *State v. Rowan*, 2017 UT 88, ¶ 22, 416 P.3d 566 (Himonas, J., concurring) (citation omitted) (internal quotation marks omitted) (first alteration in original); *see also State v. Wood*, 648 P.2d 71, 82 (Utah 1982) ("It is a fundamental rule that we should avoid addressing . . . constitutional issue[s] unless required to do so.").

¶107 As a countermeasure, the majority cites our decisions in *Conatser v. Johnson*, 2008 UT 48, 194 P.3d 897, and *J.J.N.P. Co. v. State*, 655 P.2d 1133 (Utah 1982), in support of the proposition that a navigability claim is not a necessary antecedent to an easement-

---

[13] The majority in attempting to distinguish the facts of these cases from the one presented to us here ignores the crucial issue. The parties haven't waived the ownership question; they've merely ignored it and stipulated as to its outcome in an attempt to force this court to decide important constitutional questions in an inapt context. And rather than confront this point and the general and essential pronouncement of law present throughout the myriad cited cases, the majority undertakes a case-by-case factual comparison in the hopes of distinguishing our case. *Supra* ¶¶ 45–54. These procedural pyrotechnics avoid the substantive point. The parties' failure to litigate a claim here didn't leave the issue undecided. They assumed the decision as a necessary antecedent. The problem isn't over the minutia of whether streambed ownership is technically a new claim or new authority in support of an old claim. No, the issue is that the parties litigation strategy necessitates an answer to the question of ownership, an answer the parties provided without briefing, acknowledgment, or our say so, in an attempt to mandate us to reach the constitutional questions surrounding the public trust doctrine. This we cannot allow.

based claim of public access to the Provo River. *See supra* ¶ 35. The majority's logic has no play here. Neither *Conaster* nor *J.J.N.P.* called upon us to rule on the constitutionality of a legislative enactment in relevant part. In *Conatser* we accepted that the waters were non-navigable, and that the streambed could therefore be privately owned for purposes of determining the scope of the public's easement in state water, but no question of constitutional law was before us. 2008 UT 48, ¶¶ 11–19. So too, in the portion of *J.J.N.P.* cited by the majority, we defined only the public's right to access public waters unrelated to any interest in the underlying land and without making a determination of constitutional law. 655 P.2d at 1135–37. Because making a determination of navigability in both *Conatser* and *J.J.N.P.* wouldn't have helped avoid resolving a question of constitutional law, we were able to accept that a navigability inquiry wasn't a necessary antecedent.

¶108 This isn't the case here. The PWAA reads that the public may "incidentally touch private property as required for safe passage and continued movement." UTAH CODE § 73-29-202(2)(a). Any easement inquiry rests on the unverified assumption that the streambed is private property owned by VR Acquisitions. We're unsure that this is, in fact, true. And, in this case, we cannot separate the question of ownership of the streambed from the statutory challenge at issue. We should hold off on weighing in on the constitutional questions until we have an answer to this antecedent question. USAC has already made clear that it wishes to preserve the right to pursue a navigability-based theory of access in the future should its easement-based and constitutional claims fail. It therefore seems that the parties have asked us to strike down a statute as unconstitutional when an alternative right of relief, in harmony with our legislature's statutory intentions, may render the entire exercise unnecessary. Again, "[i]t is not the habit of the court[s] to decide questions of a constitutional nature unless absolutely necessary to a decision of the case," and it may very easily be avoidable here. *Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring) (citation omitted) (internal quotation marks omitted).

¶109 Additionally, the majority's attempts to guide the parties' future arguments place, in my view, too heavy a thumb on the scale. For example, the majority, while attempting not to settle the merits of the case, presents unnecessarily strong guidance on several issues of merit. It's unclear to me as yet why article XX section 1 of the Utah Constitution *assuredly* "does not protect mere 'interests' in land." *See supra* ¶ 63. It very well may. Additionally, I don't endorse the majority's view, or any view at this time, regarding the degree of

state participation required to "acquire" or "accept" public lands or waters. I've nothing to say on this matter and look forward to a more thorough inquiry should this question appear before this court again.

### III

¶110 In short, if the section of the Provo River at issue is "navigable" then the streambed is not private property. "If a body of water is navigable—that is, if it is useful for commerce and has practical usefulness to the public as a public highway—then the state owns the water's bed." *Conatser v. Johnson*, 2008 UT 48, ¶ 9, 194 P.3d 897 (citation omitted) (internal quotation marks omitted). Any ruling defining the scope of a dominant estate to the Provo River bed necessarily takes for granted that VR Acquisitions owns the streambed, which in turn requires that the waters themselves be non-navigable. I express no opinion as to whether this last point is true or not, but a navigability inquiry logically must be settled before a private interest in the streambed can be defined. To do otherwise is to allow the parties to force this court to rule on an issue of constitutional law that determines the ownership of an estate that neither party may in fact own.

¶111 There may come a case that forces us to define the constitutional scope of the public's easement and how it attaches to privately owned streambeds, but it's not clear to me that this is that case. For this reason, I'm constrained to concur in part and dissent in part in the majority's judgment. The district court must settle the issue of navigability before making monumental rulings on the PWAA by way of a potentially superfluous public easement theory of the case.

———————